## JOSEPH AND ASHER BRAKELEY vs. GEORGE W. TUTTLE.

July Term, 1868.

1. The agreement for the advance and loan of money is only part of a contract, and it is a question of fact whether usury was intended or not; and where the contract is not usurious on its face, the question of usury cannot be raised on demurrer to the bill setting out such contract.

2. A demurrer will not lie to the equity jurisdiction where a bill alleges that the defendant, who has possession of personal property claimed by the complainant under a contract with the defendant, is insolvent and is fraudulently converting the property to his own use, and asks to enjoin the defendant, and for an account.

3. Where an injunction is docketed before the cause is formally set for hearing at rules, and a motion to dissolve is made, it is not error in the circuit court to proceed to hear the cause on its merits, if the defendant is present in court and offers no objections.

4. If hides and leather belonging to a party are by him so intermixed in his tannery with those of another, that they cannot be separated or distinguished from those of such other, they become the property of such other to the extent of any claim he may have for a definite or certain number or quantity of hides and leather.

5. T. and B. enter into a contract whereby hides are to be purchased by either of them, and to be tanned by B. and returned to T. For all that should be purchased by B., T. was to accept the drafts of B. at three months from date of purchase, and T. was to have five per centum commission or advance on the cost of the hides, whether purchased by himself or B. T. was also to have interest on the cost of the hides from the time of payment, including as part of the cost said commission. It was also stipulated that all the hides purchased were to be the property of T., and when tanned were to be returned to him to be sold. If from mismanagement, or otherwise, the leather thus returned should fail to realize the cost, charges, &c., B. was to pay over without delay any and all such de-

\*Judge Harrison was absent from illness.    The cause was heard at the January term, 1868, but not decided until this term.

ficiency to T. The hides and leather were to be insured at the expense of B. T. purchased but a small number of hides, 801, and B. purchased 10,154. HELD:

That inasmuch as T. was to receive the principal sum of money advanced, and five per centum commission thereon, with interest on the aggregate of such principal and commission, (no consideration for the five per centum commission being shown except the advance of the money) the contract was usurious and therefore void.

George W. Tuttle, of the State of New York, filed a bill in the circuit court of Preston county, on the 11th day of February, 1861, against Joseph and Asher Brakeley, partners under the firm of J. & A. Brakeley. The bill alleged that in December, 1858, the complainant and defendants had entered into an agreement in the following words:

"Memorandum of agreement made and entered into this 29th day of December, in the year one thousand eight hundred any fifty-eight, between G. W. Tuttle, hide and leather dealer, of Kingston, Ulster county, and State of New York, of the first part, and J. & A. Brakeley, tanners, of Rowlesburg, Preston county, in the State of Virginia, of the second part. Witnesseth that for and in consideration of the agreements herein contained, and of one dollar to them in hand paid by the party of the first part, the receipt whereof is hereby acknowledged, the parties of the second part agree to purchase themselves, or to receive from the party of the first part during the next twelve months, about eight thousand salted or dry hides, and to tan the same with reasonable dispatch, and in a good and workmanlike manner, at their Cheat River Tannery, into oak leather, and to deliver all the said leather in a reasonable time, at the store of the party of the first part, in the city of New York.

"For the hides purchased by the parties of the second part, as above specified, the party of the first part agrees to accept their drafts at three months from the date of purchase, and the party of the first part is to be allowed five per cent. commission or advance on the cost of said hides, whether purchased by himself directly, or by the parties of the second part as above specified.

"And the party of the first part agrees to receive the leather so tanned, and to sell the same at his discretion, for which he is to be allowed six per cent. commission and guarantee on the gross amount of the sales of said leather, and after deducting the cost of the hides and expenses thereon, with interest on the same from the time they became due, or were paid for by the party of the first part, together with any expenses he may have to pay on the leather, as well as any advances he may have made, together with the advance on hides and commission on leather, as specified, to pay over to the parties of the second part the nett proceeds of the same.

" And the parties of the second part agree, that if in consequence of mismanagement or otherwise, the leather thus returned should fail to realize the cost, charges, &c., as specified, that they will pay over without any delay, any and all such deficiency, as soon as ascertained, to the party of the first part. It is further agreed and understood between the parties, that all the hides and leather that may be in possession of the parties of the second part, by virtue of this agreement, shall be, and remain the property of the party of the first part, and that all the interest the parties of the second part have in said hides and leather, is what may be realized over and above the cost, charges, &c., as specified. And the parties of the second part further agree, that the party of the first part may have and keep the said hides, with the leather made from the same, at all times fully insured against loss or damage by fire, and charge the cost of the same to the parties of the second part as a part of the above specified expense.

In witness whereof we have hereunto set our hands, the day and year first above mentioned.

Witness,            G. W. TUTTLE,

J. C. McLaughlin.        J. & A. BRAKELEY."

That under this contract (which had been extended) the defendants had received from him, in different lots, from January 10th, 1859, to August 16th, 1860, 10,154 hides, equivalent to 20,308 sides of tanned leather, and that they returned

to him in all 9,777 sides of leather, leaving 10,531 sides yet to be returned or accounted for, of the value of 42,124 dollars, and which according to the terms of the contract would leave for the complainant a sum due of over 30,000 dollars.

The bill further alleged that in the business of tanning it was customary to mark the hides belonging to different parties in the process of tanning, and to keep a "yard book" to register the marks thus made, and that on a visit to the tannery he learned from the defendants that they were shipping leather on their own account, and had been in the habit of mixing their hides with those of the complainant during the process of tanning, and kept no "yard book" for the purpose of identification; that upon the complainant demanding an account of the hides in the tannery one of the defendants estimated the number at about 11,800 sides, of which he claimed as his own 1,500 sides; and that this result was reached by the defendant's estimating the contents of the vats and the loft and leeches, and that he got at the amount of the 1,500 sides by estimates made from a memorandum book, which defendant stated showed the labor of his men and thus enabled him to get at the quantity. That the defendants did not forward thereafter the leather as they should have done according to the terms of the contract, and that whilst they only shipped to the complainant 272 sides of leather, they shipped on their own account 4,655 sides; and that the tannery of the defendants was worth only about 10,000 dollars, and that the defendants had no other property, and therefore having no other means of saving his leather as yet undisposed of by the defendants, he asked an injunction and receivership, as the deficit of the returns for his leather could only have arisen by the fraud of the defendants. The bill also asked for an account to be had between the parties. The injunction was allowed and a receiver was appointed.

The defendants demurred to the bill on three grounds, which are stated in full by the judge who delivered the opinion here. They also answered denying some of the allegations of the bill and admitting others; the main points

in the answer were, however, the questions of the mixing of the hides of the complainant and defendants, the buying of the hides under the contract, and the allegation that the contract was usurious and void, providing for the loan or advance of money by devices and contrivances to reserve and secure to the complainant unlawful interest and profits, and that the contract was for the payment of interest at a greater rate than allowed by law.

Upon the question of mixing the hides, it appeared that the hides of the complainant and defendants could not be separated and distinguished, being in the process of tanning all put in the same vats by the defendants. It appeared that of the hides purchased the complainant bought only 801 and that defendants purchased the residue under the contract and drew on the complainant accordingly. The cause was transferred to the circuit court of Monongalia county, where it was docketed at the April term, 1862, and continued. The defendants gave notice that they would move the court at the September term, following, to dissolve the injunction. On the 5th day of September "the president and directors of the Cumberland Bank of Alleghany," and other parties who were creditors of the defendants, and to secure whom they had executed two deeds of trust, dated the 12th and 28th of February, 1861, respectively, moved the court to make them parties, alleging that the property in the bill and answer mentioned was the same included in the said trust deeds.

On the 8th of September, 1862, the court rendered a decree, counsel appearing for both parties, perpetuating the injunction, and found that there was yet 10,331 sides of leather (less 200, returned since the filing of the bill) to be yet accounted for and returned by the defendants, and that the hides and leather which had been taken charge of by the receiver, Jacob Berger, theretofore appointed, were a part and parcel of the 10,331 yet due and returnable. It also ordered the receiver to sell the hides and leather and make return of the same, and the cause was referred to a master to state and settle the account between the parties.

The defendants appealed to this court, alleging the following for errors:

"The first error supposed to be in the decree is that the injunction should have been dissolved, *and if the case were ready for a final hearing,* the bill dismissed.

1st. Because the contract referred to in the bill was and is usurious and void.

2d. Said contract was unconscionable, and as such as ought not to be aided or enforced in a court of equity.

3d. Because the title to the leather in the bill mentioned could and ought to have been tried at law.

4th. The complainant's bill only makes a case properly triable at law when in an action of trover and conversion or detinue, with the aid of an attachment, the plaintiff's remedy would have been ample.

5th. Because the bill and whole case is manifestly prepared for the purpose of getting a lien on the estate of the defendants, to the prejudice of other creditors.

6th. Because the bill seeks a specific performance of a contract in relation to *chattels* having no peculiar value over *other chattels* of the same kind.

The second error in the decree is, that after overruling the motion to dissolve the injunction, the court proceeded to hear the cause finally, without the cause being set for hearing.

The third error is in not making the Cumberland bank and others defendants.

The fourth is in deciding in the decree that all the hides on hand and in process of tanning at the time of getting the injunction, belonged to the complainant, when the testimony of Campbell proves some fifteen or sixteen hundred hides came to the tannery of the defendants *after the 16th of August,* 1860."

*N. Richardson,* for the appellants, maintained:

It is respectfully submitted that it was error in the circuit court of Monongalia county to order the docketing of the cause, or to make any order therein, for the reason that it

was not matured at rules, as it had not been *set for hearing.* The record did not give to the appellants notice that the cause would be called for hearing; and it is respectfully urged that the clerk's rule-book should show that the cause was set for hearing. Code, sec, 48, chap. 171. See also Barton's suit in equity, p. 143.

The appellee alleges in his bill that *he has delivered* to the defendants to be tanned under the contract, &c., ten thousand one hundred and fifty-four hides, the same having been *bought by him, the orator having made the purchases and deliveries* under the first contract; that the appellants began to *return* to him leather as tanned by them for him out of *his* said hides to, &c., and continued to *return* to him leather as out of *his said hides* down to &c. It will be observed that this phraseology pervades the bill, and it is evident therefrom that the bill was framed on the theory that the contract, either expressly or by implication, constituted appellants the agents or bailees of appellee. In their answer the appellants deny the correctness of this theory. They deny that appellee delivered or bought for that purpose, any such large number of hides as in said bill is alleged, or that they were at any time during the existence of said contract the agents of the appellee. The question at once arises, therefore, what is the true construction of this contract? The subject matter of the contract is to be fully considered, and the situation of the parties at the time, and of the property, which is the subject matter of the contract, and the intentention and purpose of the parties in making the contract, will often be of great service in guiding the construction. 2 Parsons on Contracts, 5th ed., 499. What, then, was the relative situation of the parties to this contract at the time of its extension, as shown by the record? The appellants were in want of funds to carry on their business successfully at the time the contract was made. The appellee had not been in any business for some time before the contract was made, and was possessed of plenty of means. The appellants were engaged in carrying on their tannery at Rowlesburg, in Preston county, Va. Being thus in want of

means, appellants naturally desired to avail themselves of the use of the means of any one from whom they could borrow. Finding in the appellee one who was in no business, with plenty of means, the above contract was entered into as the appellants supposed was their interest to do, but which hitherto has proved most disastrous to those interests.

In seeking for the true intention and meaning of the parties to this agreement, which was the result of their relative situations, let us examine the agreement itself without reference to the conduct of the parties under it. In the first place we find a total absence of the terms and phraseology generally and most naturally used in the writings intended to create the relation of principal and agent; the word agent or its equivalent, such as "factor," "bailee," &c., does not appear in the agreement; there is no delegation of any specific or general authority from the appellee to the appellants, or *vice versa*, to be found anywhere from beginning to end therein; it is an *agreement* between persons equally independent, equally bound one to the other, and equally entitled to the benefits and obligations of the provisions of the agreement. In the first place the appellants *agree to purchase themselves or receive from the appellee*, within a time specified, a certain number of dry and salted hides, and to tan the same at their Cheat Rivery Tannery, into oak leather, and *deliver all of said leather at the store of the appellee, in the city of New York;* again, it is provided that if from any cause the leather returned fails to realize the cost, &c., that appellants will pay over without delay any and all such deficiency as soon as ascertained to the appellee; appellants further agree that appellee may have and keep the hides and leather fully insured against loss or damage by fire, and charge the same to appellants. These provisions are all obligations imposed on the appellants. On the contrary, for the hides purchased by appellants, the appellee agrees to accept their drafts at three months from the date of the purchase; he is to be allowed five per cent. commission or advance on the cost of the hides purchased under the agreement; *he also agrees to receive the leather so tanned, and sell the same at his discretion,* for

which he is to be allowed six per cent. commission, &c., and after deducting the cost of the hides, &c., *to pay over to appellants the net proceeds of the same.* Appellants agree to purchase themselves upon their own responsibility, so far as the vendor of the hides is concerned, and not as the agent or factor of the appellee. They agree to receive from him, and inferentially he agrees to deliver to them, not as his own hides delivered to a bailee, for the appellants must pay him for them in the same manner as they pay for hides bought by themselves, and they are charged to them on the books of appellee as so much money. After these hides are converted into leather, the appellants contract to *deliver* it, not *return* it, as the bill alleges, and which would be the proper expression if it was appellee's property. It is at appellant's risk until *delivered;* again, *the appellee agrees to receive the leather so tanned, and sell the same.* If this leather was the property of the appellee, and had been bailed for a certain purpose, viz: tanning, there would be no necessity in binding him to an agreement to receive his own leather and sell the same at his discretion, that was his right beyond the sanction of an agreement, and it was only because it was not his leather, but was the leather of the appellants, that he was thus bound by an express contract to receive and sell the same. It is true he was to sell at his discretion, but it is a discretion which commission merchants generally exercise, and particularly in this case where he was to be repaid his loan out of the results of those sales. He is also to be allowed a commission for selling and guaranteeing the sales of said leather, of six per cent. on the gross amount of said sales. This is a perfect example of the relations of these parties. Guaranteeing the sales means that the commission merchant who sells goods on credit which have been consigned to him, guarantees to the owner that the price will be paid, and for this the usual commission is two per cent., which with four per cent. commission for selling, makes the six per cent. charged in the contract. Why should the appellee be allowed a commission on the sales of his own leather? or why a commission for guaranteeing the pay-

ment of a debt due to himself on a contract which he himself had made? The mere supposition is repugnant to all mercantile customs and the usages of trade and in violation of reason and common sense. The appellants also agree to pay interest to the appellee on the cost of the hides and expenses paid thereon from the time they became due, &c. If appellants were mere agents of the appellee upon what principle would they agree to pay interest on the money invested by their principal in the transaction of his own business? If it was intended that these hides should be the property of the appellee, and purchased with his acceptances or money, surely it cannot be supposed that the appellants would be so reckless of their interest as to agree to pay to appellee interest on money he invested for himself, and for his own benefit and advantage. If they were really his agents, purchasing for him with his funds, periodical returns should and would have been required of them, which was not done; on the contrary, as we will shortly find, the appellee felt under an obligation as their agent, selling for a commission their goods, to make returns of his actings and doings in that regard to them. The appellee is required to pay over the net proceeds of these sales to appellants, a requisition entirely inconsistent with the theory of an agency upon their part, but consistent with that of an agency on his. The agent pays the proceeds to the principal, not the principal to the agent. Again, it is provided that if in consequence of mismanagement or *otherwise*, the sales of this leather should fail to realize the cost, charges, &c., that the appellants will pay over without delay any and all such deficiency as soon as ascertained, to the appellee, a provision which is perfectly in accordance with the one here taken, that the appellee was the bailor of the appellants. If goods are consigned to a commission merchant for sale, first the charges and commissions are deducted, and if the proceeds of the sale of the goods is not sufficient to pay them the consignor must pay the difference. In this case the appellee was permitted to retain the cost of the hides, because they had been purchased by money loaned by him to appellants, and they

agreed he might. be repaid in this manner, and if the sales of the leather did not yield enough, after paying the specified expenses to repay the sum borrowed, then without any delay they contract to pay over "any and all such deficiency." Again, it is agreed that the appellee may insure the hides and leather against fire, and charge the expense of so doing to appellants. It is usual for men to pay for their own insurance, and not that of others, and if this leather was in fact the property of the appellee, where was the occasion.of an express agreement with the appellants that they would permit him to insure it against loss by fire, a·right which he had in the absence of any such provision, and it is against reason that appellants would agree to pay for insuring property to which they had no title. Nor is this position inconsistent, but it is in perfect harmony with that part of the contract which provides that all the hides ·and leather which may be in possession of appellants by virtue of the agreement, shall be and remain the property of the appellee, &c. If it was the intention of the parties to occupy towards each other the relation of principal and agents, why specify that the principal should be the owner of property purchased by himself with his own money? It cannot be contended that this provision passed the property in the hides and leather contemplated by the contract. For granting that one may sell what he has not now, and has made no contract for purchasing, but intends to go into the market and buy, as by the later authority and better reason it seems he may, yet the law will regard such an agreement as a contract for a future sale; and not as a present contract or sale; and therefore the property in the thing, when it is acquired by the proposed vendor, does not pass at once to the proposed vendee, until the actual sale be made. 1 Parsons on Contracts, 523–4. The appellee was not responsible for any purchase made by appellants, of hides under the contract. His whole responsibility was by virtue of his acceptances, and to no extent by virtue of any agreement made by them with the vendors of hides. They had no authority to act in his name or to bind him by any·

agreement they might make with third persons. He was responsible for the payment of his acceptances, and upon them and them alone. Had they been his agents or factors their contracts for the purchase of hides without the aid of his acceptances, would have bound him. But all the hides bought by them under the contract, they, in the language of the contract, "purchased themselves," except eight hundred and one which they received from appellee.

The preceding portion of this argument has been confined to the provisions of the contract itself. Happily we are not confined merely to its provisions for its true interpretation. The acts of a party to an agreement in relation to those things which relate to and are comprehended by the agreement surely afford evidence of the understanding under which it was made. And of all the acts and doings of the party, those which immediately succeeded its execution will certainly have the most influence in leading us to a correct knowledge of the intention of the parties. Then the provisions of the contract and the reason why they were inserted as well as the spirit and sense in which they were mutually understood, is fresh in the minds of the contracting parties, and they involuntarily act in accordance therewith. What then are the acts of the appellee in regard to the subject matter of this contract, by which we may discover his understanding of the effects of its provisions? In the first place, as stated, the appellee feels under obligations to make a full and exact account of all sales which he makes of leather received by him from appellants. This is not in accordance with the idea of an agency on the part of appellants. But it may be replied that this accounting by the appellee is rendered necessary by the provision in the contract which gave him the right to deduct from the amount of sales the cost of the hides and expenses paid thereon, &c. But does not the provision which renders the accounting proper or necessary, repudiate the idea of an agency? Its only true interpretation is that the appellee has made to aplants a loan, and that, out of the proceeds of the sales of appellants' property made by the appellee, he was to retain

the amount of his said loan, together with the stipulated interest. If they were his agents there was no propriety of an account from him to them. If, however, he had loaned the money and received payment in this manner a statement from him was necessary. He received back his principal with interest and five per cent. commission over and above the legal interest, also a commission for selling and guaranteeing. These must be accounted for.

It is respectfully insisted then that the contract of December 29, 1859, vested in the appellee no right of property whatever in the hides purchased or leather manufactured under it. That the language of the contract and the conduct of the parties with reference to those matters affected by its provisions, repudiate all idea of such a right. What relation then did this contract create between the parties thereto? As before stated, the appellants were in need of money to carry on their business, and wished to avail themselves of that owned by the appellee, while he being out of business and possessing plenty of means, desired to invest those means in the manner which he supposed would yield him the largest return. Under these circumstances they agree that in consideration of the loan of his money, or its equivalent, to them, they would secure to him the selling of a large quantity of leather at a commission of six per cent. for selling and guaranteeing the sales; would pay him five per cent. commission or advance on the cost of the hides purchased; that is upon the amount of his three months' drafts, which being repeated four times a year yielded twenty per cent., and then pay him legal interest on the amount of his acceptances from the time they became due; pay all expenses of every kind of hides and leather, and allow him to repay himself the amount of his acceptances out of the money received on sales of the leather which it was agreed he should sell for the above commission. He under these circumstances agreed to make to them the loan. The contract constituted the relation of lender and borrowers as to drafts accepted and hides furnished, and also made the appellee the agent of the appellants to sell their

leather. This brings us to the consideration of another error alleged upon the record, viz: that this contract was, and is, usurious and void, and ought to have been so declared by the court below. The simplest definition of usury is the taking of more interest for the use of money than the law allows. 3 Parsons on Contracts, 107. Some of the devices resorted to to evade the usury laws it is difficult to detect or to prevent, but in all cases the only question is, has one party had the use of the money of the other, and has he paid him for it more than lawful interest in any way or manner; and in this determination the contract will not be held good, merely because upon its face and by its words it is free from taint if *substantially* it be usurious. 3 Parsons on Contracts, 110. The general rule is that interest is to be paid on contracts according to the law of the place where they are to be performed in all cases where interest is expressly or implicitly to be paid. Story on Conflict of Laws, sec. 291. The contract of December 29, 1858, and the endorsement thereon was made in New York; the loans were there made and were there to be paid in the manner in the contracts specified. The question we are now considering will therefore be governed by the laws of that State relating to it. The rate of interest upon the loan or forbearance of any money, goods or things in action in the State of New York, was at the date of the contract seven dollars upon one hundred dollars for a year. Sec. 1, title 3, chap. 4, part 2, Rev. Stat. N. Y.

By the 2d section of the above mentioned title it is provided that no person or corporation shall directly or indirectly take or receive in money, goods or things in action, or in any other way any greater sum or greater value for the loan or forbearance of any money, goods or things in action than is above specified; and by the 5th section it is provided that all bonds, bills, notes, assurances, conveyances, and all other contracts or securities whatsoever (except bottomery and respondentia bonds and contracts) and all deposits of goods or other things whatsoever, whereupon or whereby there shall be reserved or taken or secured or

agreed to be secured or taken any greater sums or greater value for the loan or forbearance of any money, goods or other things in action than is above prescribed, shall be void, &c. A draft is *a chose in action*. The contract is substantially for the loan of the appellee's drafts at three months, for which he is to receive five *per centum* on the amount thereof. There are four of these drafts during a year, making in all during one year twenty per centum on their amount. For example, suppose that on the 1st of January, 1859, a draft drawn in pursuance of the contract is accepted at three months, the appellee takes under the contract five per cent. thereupon. On the first of April the draft falls due and is paid and another draft is drawn and accepted, five per cent. is paid on this, and so on the 1st of July and 1st of October, thus realizing to the lender twenty per cent.; besides the contract provides for interest on the whole making in all twenty-seven per cent. upon the acceptances after they become due or are paid by the appellee, and it will be observed that this interest of seven per cent. is calculated not only on the cost of the hides, but on that cost with the commission added. It cannot be said that these commissions and advances of five per cent. is for accepting drafts, for this provision is for the benefit of the appellee. He accepts the draft rather than pay the money. It is a provision prejudicial to the interests of the appellants. Had they received the money instead of the drafts at three months, they would have been able to buy for cash, and consequently at a rate much lower, perhaps, than they could on time. They could have bought for a cash price instead of a time price, the difference being from three and a half to five per cent. Nor was it as a compensation for any risk encountered by the appellee, for there was no venture upon his part; as to that he was exactly in the position of any other lender of money or chose in action. According to the provision of the contract if from any cause the leather returned fails to repay him his loan he is to have such deficiency repaid to him by the appellants without any delay. No saving clause for the appellants. If through misman-

agement, misfortune or the extraordinary and unconcionable character of this contract they failed, the appellee must be paid at all events and without delay. The appellants were obliged to return to him not only his loan but the usurious interest thereon.

For what then was this five per cent. commission or advance? What was the consideration for it? What did the contracting parties intend by it? It was not for accepting nor as compensation for any risk incurred. Is there any other consideration, therefore, to be gathered from the contract than that it was one of those countless devices and subterfuges resorted to by the usurer to enable him to get unlawful gains and yet evade the consequences which the law prescribes. But as stated by Lord Mansfield in *Floyer* vs. *Edwards*, 1 Cowper, 112, "in all questions, in whatever respect repugnant to the statute, we must get at the *nature and substance* of the transaction. The view of the parties must be ascertained to satisfy the court that there was a loan and borrowing, and that the *substance* was to borrow on the one part and to loan on the other, and where the real truth is the loan of money, *the wit of man cannot find a shift to take it out of the statute*. If the *substance* is a loan of money, nothing will protect the taking more than five per cent., and though the statute mentions only 'for loan of moneys, wares, merchandize or other commodities,' yet any other contrivance, *if the substance of it be a loan*, will come under the word indirectly." This proposition is endorsed by the court of appeals of New York, 3 Comstock, 366, and that high tribunal goes on to enquire "what is the difference between a man's lending his notes to raise money upon, taking more than legal interest, and lending his money? I confess I can see no other difference than this, that the borrower of the notes must probably pay more usury to get them converted into cash; but the transaction is substantially a lending of money, and  *  *  if this course be tolerated the lending statute is judicially repealed;" and the difference stated by the learned judge in the above quototion existed in this case to a degree greatly detrimental to the interests of

the appellee, for we find from the testimony that they not only paid the enormous interest specified in the contract, but were subjected to a further injury in being compelled to pay "at the rate of from seven to twelve per cent. a year," and as high as "two and a half per cent. a month," to get the drafts converted into money. Not only is this true, but we observe that the portion of interest endeavored to be covered up under the name of "commission or advance" is charged to the appellants immediately on the acceptance of the drafts at three months, making under the contract twenty per cent. retained or charged in advance during the year, and after these drafts become due or are paid by appellee he receives legal interest on them. This is usurious. "If the lender should make his note or bond issued for the loan payable at a future day without interest, reserving at the same time full interest on the amount from the date, this would be usury." 4 Comst., 474. In this contract the lender not only charges an amount equal to the interest for three months, but much more. For these reasons and others perhaps more cogent, which will readily present themselves to the court on an inspection of this record, it is respectfully urged that this contract was, and is, usurious and void according to the laws of the State of New York, where it was made and where it was to be performed; and for the same reason that it is also void according to the laws of Virginia existing at the time of its date.

Assuming that the legal title to the hides and leather contemplated by the contract was in the appellants; that the appellee was their agent for the sale of the leather, and had no interest therein except his commission, which was contingent upon sales made by him, the question at once arises: Do the facts arising upon this record make a case within the jurisdiction of a court of chancery? I most respectfully insist that they do not and that the injunction should have been dissolved and the bill dismissed. This is in effect a bill to compel the specific performance of a contract relating entirely to personalty. The general rule now is not to entertain jurisdiction in equity for a specific performance

of agreements respecting goods, chattels, stock, choses in action, and other things of a merely personal nature. 1 Story's Eq. Juris. Eighth Ed., 718. It is true that this rule is not adopted with reference to the personal character of the property. It is rather synonymous with that fundamental general rule that equity affords relief in regard to those rights recognized by the jurisprudence of the State where the remedy at law is doubtful, inadequate, or incomplete. The rule above stated, therefore, is subject to exceptions, or rather it is limited to cases where a compensation in damages furnishes a complete and satisfactory remedy. *Ib.* It is therefore our duty to discover whether this case falls within the general rule or is it within any of the exceptions thereto. The exceptions consist of those cases of agreements respecting personal property where a complete and satisfactory remedy cannot be had at law, and if in this case such remedy is afforded by the courts of law, equity will not take jurisdiction for it is founded upon a contract respecting personal estate. I have heretofore considered the question of the right of property in the hides and leather set up in the bill, and it is not pretended therein that appellee had any lien, but it is in substance alleged that he was the owner. Is the appellee entitled to the discovery prayed for in his bill? Was it necessary to the protection of his rights? If, but for the want of said discovery, the case would be properly remediable at law the bill will be entertained, and the necessity of obtaining a discovery in such cases therefore constitute the sole grounds of equity jurisdiction. *Ib.*, sec. 690. There must be a *necessity* for a discovery. Such a state of facts must exist as to make it impossible for the party to pursue his remedy at law for the want of it. This is the irresistible inference to be drawn from the language of the learned author in the section last referred to. No such necessity existed in this case. A duplicate of the contract upon which this action was based was in the possession of the appellee as also were the accounts of transactions had under it which affected his interests. He had a full and complete right to sue upon the contract at law and if upon its proper

construction by a court of law and the investigation of the conduct of the parties under it by a jury it was found that the appellants had violated its provisions or any or either of them, he could receive adequate compensation in damages.

The contract is unconscionable and such as ought not to be aided or enforced in a court of equity. A mere glance at its provisions is sufficient to show that had they been carried out to their fullest extent and in the utmost good faith, it must in the end have worked the insolvency of the appellants. Whether the "commission or advance" be considered as interest or not, it was entirely without consideration, and in its practical workings took from the appellants at the rate of *twenty per centum per annum*. The doctrine may be generally stated that courts of equity will not interfere to decree a specific performance, except in cases where it would be strictly equitable to make such a decree. 1 Story's Equity, sec. 750.

I shall call the court's attention to but one other point arising upon this record and then leave the case. That is that the decree of September 8, 1862, should be reversed upon the complainants own theory, because it is in evidence that after the appellee had refused to accept more drafts, August 16, 1860, and thereby again violated the contract, the appellants bought with money raised without his aid, fifteen hundred and twenty-six hides; these were delivered to them on September 11, 1860, and were in one form or another in their tannery at the beginning of this suit. There can be no pretence that they did not own. the leather made from hides purchased by themselves without the aid of the appellee; and yet in this decree the court makes no distinction. They were entitled on their own showing only to specific property. This decree is not confined to such, but is, notwithstanding the evidence above referred to and the allegations in the bill, directed against the property in leather and hides generally belonging to appellants and at their tannery. It is respectfully urged that this course is not in accordance with the practice in chancery, and that for this error the de-

cree should be reversed and the appellants reinstated in the position they occupied before it was rendered.

The reasons hereinbefore stated are but a few of the many appearing in this case, and showing the irregularity and want of equity in the proceedings had therein, and when it is remembered that at the time this cause was pending before the court below, confusion reigned almost supreme in this portion of what was then Virginia; that the excitement which prevailed rendered it almost impossible to adhere to the sober, legitimate way of transacting even the business of our courts; that our courts were without officers for a time, and military power which the appellee seems to have used without scruple was the only arbiter, it will not be matter of wonder that in a record so voluminous errors were committed in the admission of testimony clearly illegal, to which objection had been made—that important matters had been overlooked and errors in judgment made.

*Wm. Ware Peck* for the appellee.

1. The contract set forth in the bill is not usurious.

The contract is to be construed according to the laws of the State of New York, hence the stipulation of counsel, making the books containing the statute and adjudications in New York upon usury, evidence.

Therefore the statute of New York in force, when the contract was made, 1 Rev. Stat., Tit. 3, ch 4, pt. 2, sections 2, 3, 4, with its construction as established in the courts of New York is to govern in determining the question of usury. It does not seem, however, to differ in substance from the statute of Virginia, Code, ch. 141, pp. 623 and 4; but the import and construction of the latter are immaterial, except so far as they may illustrate.

2. The proposition advanced under this assignment is, that the funds were loaned by Tuttle to the Brakeleys; and with them they purchased the hides on their own account, and as the exclusive owners; that his relation to the property was that of factor and lien creditor; and to the money that of lender, the profits reserved to him constituting an

excessive rate of interest.    If the funds were only *entrusted* by Tuttle to the Brakeleys to buy the hides with for him : the hides to turn into leather : and that to release him ; the property was at no instant of time out of him, at no instant of time in them.    It was throughout in him in the successive forms of money, hides and leather.    He was principal; they were agents.    His charges were merely deductions from his own funds : their interest limited to a contingent residuum ; they owning nothing in the property, having at most but an implied lien upon it as security for the residuum.    There was then no usury, for there was no loan : for the relation of borrower and lender did not arise.    To find usury the court must find a loan.

The following propositions will test the application of the statute of New York to a case arising under it.    They present the principle of the New York statute ; of the English statute, from which the power is derived , of the Virginia statute ; and, it is believed, of the American usury acts generally.    Several of the propositions are self-evident, but have their place in a proper analysis of the law.

One cannot be borrower and lender to himself.    He cannot borrow of himself ; therefore cannot take usury of himself.    The two-fold character cannot arise out of the same transaction and reside in the same party.    The relation necessitates the existence of two and opposite parties.

Therefore the contract of loan in the sense of the statute implies that thereby the title to or ownership of the thing loaned has passed from the lender to the borrower.    The term " *loan*," in its popular, also in its juridical sense imports that the *identical* thing loaned is to be returned ; as the loan of an animal or an implement.    Contracts of loans, other than those contemplated by the usury act, are mere bailments.    The term "loan," as employed in the English and American statutes relating to usury, has a peculiar and technical meaning ; not that the *identical sum* loaned and *identical funds* handed to the borrower are to be returned plus the price ; but merely that the *identical sum* loaned, plus the price, be returned : lender and borrower mean sim-

ply creditor and debtor, not bailor and bailee. Therefore a contract of loan in the sense of the statute, does not imply the transfer merely of a usufruct. It also assumes the existence of an engagement to repay the money borrowed: that is the same amount, plus the price.

The statute applies the term and idea of loan to *money* as the principal and basis of a loan. The usury is but the excess of the price prescribed for the use of the money, and the price is made uniform, because the value of money is in legal contemplation uniform. Consequently the term and idea cannot apply to anything besides money: that is, to other kinds of property; for, having no uniform value, no uniform price can be predicated of the use of them. In attributing a uniform value to money the statute adopts a fiction against the fact; in attributing a lack of uniformity to other descriptions of property, it treats them according to the fact. The distinction is arbitrary, but fixed and imperative, and regulates the effect and operation of the statute as perfectly as if formally recited in it, and, therefore, must be taken as the starting point in determining the application of the statute.

Hence the expression in the New York statute, sections 1 and 2, "*loan or forbearance of any money, goods, or things in action.*" does not include transfers made *in intent* and form of other kinds of property, whether by sale, exchange or bailment; but advances of money *disguised* in the form of transfers of other kinds of property, whether by sale, exchange· or bailment. The same is true and for the same reason of the transfers of real estate, though the statute in terms neither extends to nor hints at a transfer of real estate in any form. If a sale of goods or stocks is made, and is intended as· such, it must stand as such, whatever the price is; and the case is not one of usury. Inadequacy of price does not affect the sale, therefore exorbitancy of price does not affect it. It is only in determining a *latent* intent that the latter is material, and then only as a circumstance. So of a sale of lands. So too of an exchange, whatever may be the inequalities of value. So too of a bailment, whatever the

considerations entering into the contract may be; or however they may be arranged. The capacity and power of the parties as to the terms of negotiation are unlimited, so far as respects the statute, provided they are sincere. But if a sale or stock of goods for a *cover* of advance of money at an extra rate; as where, as between the parties the goods or stocks are resorted to as a source be for obtaining the money covertly by a resale, pledge, or other arrangement through the nominal vendue, the proceeds to be used as an advance of money at an extra rate, the contract is usurious. So of of a sale of lands : of an exchange of articles : of a bailment.

Therefore this expression, *"loan or forbearance of any money, goods, or things in action,"* sections 1 and 2, is equivalent to the expression, *"loan of money directly or indirectly,"* and this *is* the expression in the corresponding section of the 12 Ann, with which the New York statute, as held by the courts of that State, is synonymous.

Consequently in applying the statute, if the transaction is in terms a loan of money, the inquiry is reduced to a simple computation of the rate reserved. If in terms it is not a loan of money, but a transfer of other property, the inquiry is whether it was intended to be a loan of money; if the latter, whether the rate reserved is usurious. The usurious intent must be mutual. 3 Comstock, 344, *Dry Dock Bank* vs. *American Life Insurance and Trust Company*, fully sustains these propositions of law, is a professed construction in the court of last resort in New York of the usury act of that State; is recognized by all the later decisions there; and therefore presents the statute as it operated when the present contract was made.

It follows that if the contract contemplates merely a joint enterprise of profit and loss; the money and the proceeds of the money employed in it belonging to Tuttle, usury cannot be predicated of it. There are then two questions, either of which does, both of which must determine the subject. *Did the property remain in him ? Does the contract contemplate such an enterprise ?* Is the contract usurious, either upon its face, or as a *"shift or device,"* disguising a latent intent of usury.

The contract is not usurious *upon its face:* that is, as a matter of law under the demurrer it cannot be held usurious. According to its *face and terms the property in all the stock covered by it vests solely in Tuttle, the Brakeleys having no ownership in it, only a contingent residuary interest in the proceeds of the leather, and bearing to him only the relation of agents:* the stock impliedly standing as security to them for the residuum, a trust attaching to him as principal faithfully to account for it. Every provision in the contract requires this construction, and none of the provisions will harmonize without it.

By the first sentence it is evident that the hides were to come from the same source and to stand upon the same basis of title. The Brakeleys were to receive of Tuttle or themselves to purchase hides; the same hides convert into leather, and the same leather deliver to him. As to the hides, which should be received of him, they were clearly mere agents; their duty being to receive from him a thing, improve and return it, making the contract a bailment, or *locatis operio faciendi.* Story on Bail., sections 8, 368–371, 421, 422. As to the other hides the term *"purchase"* is as descriptive of an act of agency as of one of ownership, and what it means in the particular instance is determinable by what the purpose of the purchase was. Having purchased, they were to work upon the hides and the product deliver to him, not as factor, for the reverse appears in the subsequent provisions; not as buyer, for no terms of sale are indicated; *therefore as owner.* The antithesis contained in the expression, *"purchase themselves, or receive of Tuttle,"* indicates that *purchase* meant the mere *manipulation or work of purchasing,* which they might do instead of Tuttle. This interpretation of the clause leaves the sentence harmonious: a different one involves several embarrassments. It is the office of interpretation of a contract to find harmony in its provisions. Greenleaf's Ev. In the latter case, as to hides received of him, they would be his agents: as to hides purchased by themselves, he would be their agents, and the contract entirely blind as to when and under what conditions this status of agency in them should shift to an agency

in him, and *vice versa*.   Each might with equal right require the other to furnish the hides, and thus the contract would neutralize itself *in limine*, and defeat all action under it. *Again*, it is claimed as a starting point, and as a controlling consideration in the interpretation of the contract that the Brakeleys had no cash capital for their tannery, and that they made this contract for the purpose of supplying themselves with capital; that the whole contract stands upon this theory.   This admits that they had no means to spare.   The 8,000 hides as supplied extend to embrace 44 of bill of March 12, 1860—paper No. 32—at cost of 44,846 dollars and 31 cents, or 5 dollars and 60 cents a hide.   The contract called for 667 hides a month—at cost of 3,735 dollars.   Consequently the Brakeleys could have no motive to reserve the right of furnishing the hides; and their purpose would have been defeated in subjecting themselves to the duty of supplying them.   *They therefore understood that all the hides were to be supplied by Tuttle.*   The subsequent provisions apply equally to both classes of hides.

*b.  As to the second sentence.*

The purchases made by the Brakeleys were to be made by his acceptances of their drafts; he being thus the source of payment for these hides; therefore the purchaser: accepting for a purchase being equivalent to giving a note for it.

The acceptances were to be at three months from date of purchase, thus securing to him, as purchaser, a credit of three months on the purchases.

With respect to the commission of 5 *per cent.*, it is claimed in the answers that the contract, upon its face, reserves interest at the rate of 27 *per cent. a year:* as explained in the argument for the appeal, consisting of 7 per cent. allowed by the New York statute, and 5 per cent. on each acceptance, there being four acceptances a year at three months each, the acceptances representing loans.   If the acceptances were loans, according to the law of New York this commission could not be treated as interest, and the supposed advances therefore usurious, because the considerations

passing between the parties were complex, "*the* agreement for the loan being only *part* of an entire contract embracing other matters," in which case the contract cannot be treated as *per se*, or according to the legal effect of what appears upon its face as usurious. See 27 New York, 137, *Smith* vs. *Marvin*—particularly the opinion of Judge Selden. But this theory, on which the whole question of usury, as raised by the answers, turns, is entirely assumed. *In the first place*, there is in the contract no engagement by the Brakeleys for the repayment of the acceptances or of money borrowed. *In the second place*, this commission is called in the contract, "*commission or advance*," and in its connection signifies merely "*profit*," as explained in 21 Barbour, 92, *Hyde and others* vs. *Cookson and others*, where, in a contract the same as this, the expression was simply "*commission on cost of hides.*" *In the third place*, this "*commission or advance*," is put, *not* upon the *acceptance*, but upon the "*cost of the hides.*" According to the evidence of Schultz, and other experienced tanners, the tannage of a hide requires an average of eight months. Now, if one month be allowed for receiving a bill of hides at the tannery after purchase, and delivery of the leather from it at New York after completion, and three months for the leather to stand upon the market before sale—and this seems to be a reasonable allowance—as the 5 per cent. could be realized only out of the sales—upon an average, a year would intervene between an investment in a bill of hides and the payment of the 5 per cent.; so that the alleged 27 *per cent.* a year sinks down to 12 *per cent.* a year; and, if the stock belonged to Tuttle, was a deduction from his own funds; not interest paid by the Brakeleys for money borrowed, but part of the preferred profits in a joint enterprise based on capital furnished by one of the parties.

The word cost in this sentence applies *equally to hides to be received from Tuttle or purchased by the Brakeleys;* shewing that they were to come from the same source and to stand upon the same basis of title.

Consistently with this and with no other idea follows the antithetical expression, "whether purchased by himself di-

rectly or by the parties of the second part *as above specified;"* which is synonymous with the expression, "whether purchased by himself directly or through the parties of the second part *as above specified:"* confirming all the interpretation thus far of the contract, particularly that of the first sentence.

The third sentence consists of two parts, the first relating to the power of sale, the second to the division of the proceeds.

*As to the first:* The power reserved by it to Tuttle is a primary badge of ownership in him. It is to sell the leather at discretion. The discretion applied to all leather; was entire, covering the whole subject, was absolute, exclusive and irrevocable, and subject only to the implied duty of good faith; the Brakeleys had no discretion in the matter, and could in no wise interfere, except it might be to enforce good faith. *As a factor*, Tuttle's discretion would merely have been to sell according to the state of the market; the discretion being subject to the will of the principal. *If a factor*, then the Brakeleys stripped themselves of the essential power of ownership, conferring it upon their agent, inverting their relations with and subordinating themselves to him. The agent is the creature of the principal; the law will not presume such an intent in the latter, but the reverse. The presumption must be adhered to in the absence of a clear intent to the contrary; and therefore when it harmonizes with the other provisions of the contract. It does harmonize with all the previous parts of this contract, and will be found to be in full accordance with the others.

*As to the second part of the sentence, he* is to deduct from the proceeds of the leather the cost of the hides, before the Brakeleys can touch the fund: a thing irreconcilable with the idea of ownership in them. In specifying the charge of interest, he is described as having "*paid*" for the hides, and so in terms as the purchaser.

There is no provision in the contract rendering the Brakeleys his primary debtors, and subjecting their personal responsibility as such. By this third sentence he is to look

primarily to the stock, his own property improved by them, for a return of his expenditures, and the formal reservation of the power of sale was to avoid any embarrassment which might arise in case of a difference of opinion between the parties as to sales; becoming thus a proper accompaniment of his right and duty to look to the stock.

*As to the fourth sentence:* The leather without discrimination is spoken of as "*thus returned;*" showing that it came out of Tuttle; else, though *consignable* (a term in commercial law equally appropriate to the sending of property to an owner or agent,) it would not be *returnable* to him. *To return is to go back to the source or starting point.* Its use here would be inappropriate to hides neither purchased, possessed or owned by him; it would be appropriate to hides purchased for and owned by him, and of which he thereby acquired the constructive possession. In 3 Seld., 432, *Foster* v. *Pettibone*, cited below, the word "*return*," employed in a contract for the delivery of property by A. to B., was held to determine that the contract was a bailment: the question being whether it was the latter or a sale. The expression in this sentence shows that the word "*deliver*" in the first sentence means there, "*return.*"

The duty imposed upon the Brakeleys to supply deficiencies in the leather can be predicated only of an agency in them. Treating them as owners and him as a lien-creditor, the provision is superfluous. Parties to a contract are supposed to express themselves not idly but for a purpose. Between two interpretations of a clause, of which one renders it useless, the other operative, the latter will be adopted, other things being equal. 3 Seld., 432, *Foster* vs. *Pettibone*; 4 Comstock, 76, *Mallory* vs. *Willis*, in each of which cases the bailee guaranteed against deficiencies.

Treating him as owner and them as agents, in view of their great distance from him, of the magnitude of the investment and of their power over its results in the selection of the hides, in the tannage and as their other management of the property, this provision was wisely adopted to secure a faithful execution of their trust. It would not render them

responsible for deficiencies arising from his conduct; but would apply to all other cases of deficiency, and without regard to the question whether they were traceable to their conduct or not: thus avoiding all embarrassments that might otherwise arise upon the question of proof as to whether the cause of loss was or was not within their control. Being thus insurers up to a given point, they could not be either debtors for money borrowed or owners of the property. This duty to insure their work—the buying, tanning and delivering, corresponds to his to insure the sales, out of which their residuum was to come.

In the sixth sentence, relating to insurance, the expression to charge the expense of insurance to the Brakeleys "*as part of the above specified expenses*," means to deduct it from the fund as the other expenses are to be deducted according to the third sentence. The right of deduction is specified because the contract intends to define and limit Tuttle's deductions. The expression, "*may keep the stock fully insured*," puts upon him no duty of insurance, but recognizes in him the right to an owner's insurance; a factor having no right to insure beyond his lien.

According to the fifth sentence "*all the hides and leather that should be in the possession of the Brakeleys, under the agreement, should be and should remain the property of Tuttle.*" Consequently hides purchased by them could come into their possession only under his title, and that must have commenced with the purchase. Next appropriately follows, as the necessary result of all the other provisions, the further provision that "*all the interest of the Brakeleys in the stock should be such residuum as might remain of its proceeds over and above Tuttle's deductions.*" This sentence is a formal declaration of the status of title, of the relations of the parties, and of the mode of compensating the Brakeleys as agents, and perfectly concurs with the interpretation called for by the other parts of the instrument, leaving no room for doubt as to the intent.

The endorsement of December 29, 1859, is in entire harmony with the original contract, and assumes its meaning

to be that which has already been attributed to it. It provides for an extension of the latter, so as to embrace purchases of hides beyond the supply originally intended. If it is merely an extension, the original contract must otherwise remain in force: the relations of the parties to the property and to each other the same. It declares that the "provisions of the contract shall continue so long as may be mutually agreeable." The "additional hides" are to be "bought by Tuttle directly or through the Brakeleys;" and upon his acceptances; leaving the source and mode of payment the same—Tuttle the principal, the Brakeleys agent.

By the law of New York where the owner delivers materials to another to be worked upon and then returned, the contract is a bailment, *locatio operis faciendi*; no title passing. It is immaterial whether the form is to be changed, or what is the mode of compensation. If the deliveree may at his election return the specific thing delivered to him, or its proceeds; or some other thing, the contract is one of sale, or exchange, the title passing. If the terms would otherwise leave it in doubt whether the title has changed or not, and a new article is made by combination with other materials, he owns the product, who furnished the principal material. Upon either of these principles Tuttle would by the contract own the leather; the hides being the basis of the new product.

7 Johns. 473, *Merritt* vs. *Johnson;* 19, 44, *Seymour's* vs. *Brown;* overruled in subsequent cases. 7 Cowen, 752, 756, *Hurd* vs. *West;* 21 Wen., 83, *Smith* vs. *Clark;* 3 Hill, 28, *Peirce* vs. *Schenck;* 2 Comstock, 143, *Norton and others* vs. *Woodruff;* 4 Comstock, 76, *Mallory* vs. *Willis;* 2 Selden, 44, *Wadsworth* vs. *Alcott;* 3 Selden, 433, *Foster* vs. *Pettibone;* This is is the general law. 2 Kent's Com., 588–590; Story on bail, §§ 193 and 194, 439, etc.; Parsons on Contracts; 7 Blackf. Ind., 353, *Ewing* vs. *French;* 8 Green N. J., 101, *Parker* vs. *Roberts* referring to 3 Hill, 28; 10 Barr, 217, *King* vs. *Humphreys.*

*Again:* If usury could be predicated of a usufruct; receiving funds only to turn into hides, then into leather, and

the product, when complete, to return to Tuttle, the Brakeleys were not to have a usufruct of the property in any of its forms; and there was no basis in this particular, to which any could attach.

There is then no element of usury in the case. The proposition, on which the analysis of the contract is based—"*Secondly*, 1, (3)," supra—is correct. The Brakeleys were to have no ownership in the stock; only a contingent residuary interest in its ultimate proceeds; the contemplated enterprise being an adventure on joint account as to profit and loss based upon the relation of principal and agent; the former to have a preferential claim upon the profits, the latter a dependent claim upon them, and therefore subject to the fluctuations of the market: his expenses and commissions coming, not out of them but out of him, because out of his stock and serving to reduce and define the residuum. It was equally competent for the parties to adopt as a rule for ascertaining his share one or several items of deduction, a gross sum or a per centage: the difference was in mode not in principle; the result the same. The parties met to negotiate. The Brakeleys said to Tuttle, "Each shall contribute time and labor: we have no money, you have: contribute that also, and you shall be preferred in the division of the proceeds, so far at least as to have your share absolutely. We will take our chances as to whether any and what may be left for us." So far clearly they might contract. If they could validly agree to divide the risk equally, if they might agree to divide it unequally; if they might go so far, they might agree that one should be at no risk, the other at all the risk and with it have a chance at the largest share of the profits. Such was this case: one party taking an absolute and limited share, the other a contingent and unlimited share. The mutual prudence and sagacity in this are manifest. As to the agents; the fate of the adventure was mainly in their hands. All the hides might have been, in fact most of them were purchased through them. Upon the faithful investment of the funds, upon a skillful selection of stock and a proper tannage the market value of the

leather and so the fruits of the enterprise depended. As to Tuttle, the agents were likely to be more faithful under a contingent than under an absolute division of profits.—Upon this as an underlying principle a large variety of joint adventures are formed between parties as principals, and between parties as principals and agents, where one furnishes the quick capital and is allowed a preference in the division of the proceeds.

The entire argument for the appeal as to the question of usury is now answered. No authority cited in support of that argument in this connection conflicts.

4 Watts—121—*Jenkins* vs. *Eichleberger*, if opposed to the New York cases, can have no influence—but it merely raised the question whether a transaction was a sale or bailment: and cannot illustrate a case, where the only question as to title is which party was bailee of the other.

*Basset* vs. *Armstrong* and others, 6 Michigan—401: and *Hyde and others* vs. *Cookson and others*, 21 Barb., 92, *are in principle, and the latter in form the present case over again; and both fully sustain this contract.*

The following cases, more particulaaly showing the law of New York, are strong cases in point upon the question of usury.

19 Johns. 100, *Trotter* vs. *Curtis;* 4 Wen., 680, *Cummings* vs. *Williams;* 17 Wen., 280, *Hall* vs. *Haggart;* 1 Seld., 315, *Bull* vs. *Price;* 44 Barbour, 521, *Powell* vs. *Jones;* 30 New York, 197, *Bullard* vs. *Rogers;* 5 B. and Ald., 954, or 7 Eng. C. L., 914, *Gilpin* vs. *Enderley*—cited at length by the Court in 7 Leigh—*Steptoe's Adm's* vs. *Harvey's Executors*, at page 528.

(4.) The contract is not usurious *in fact.* As to usury *in fact*, and existing dehors the instrument, and in the understanding of the parties, and disguised by the instrument not itself importing usury, but operating as a *"shift and device"* to cover it.

In the present answers, the defence of usury is raised only by demurrer, and is therefore limited to a charge of usury as existing upon the face of the contract by legal

intendment. The answers at pages 21 and 22 are a mere amplification of the demurrer set forth at page 11, and in alluding to Tuttle's practice of charging 5 *per centum* in his accounts, speaks of it as done in accordance with the contract as it reads, and therefore sets up nothing new.

The motion to dissolve was made November 8, 1861, after the answers and replication were in and the issues found—and, while it reaches a proceeding which could not be reached by the answers, namely, the injunction, is limited to the issues raised by the answers. Therefore the question as to usury in fact is not an issue upon the appeal. If it is an issue in the case, it can only be under the motion to dissolve.

Treating usury in fact as an open question. In the first place it is a noticeable circumstance that there is no hint of it in the answers—and that the arguments for the appeal in this connection point out in the transactions under the contract nothing but what is in harmony with the contract. In the second place, these transactions were in entire accordance with the contract, and from the first down to suit proceeded strictly upon the idea that the property was in Tuttle; that the Brakeley's were his agents; and the enterprise a joint one of profit and loss. In these transactions the 5 per cent. commission on purchases was deducted by Tuttle out of the proceeds of leather as returned to him under the contract. If the right to deduct this commission did not render the contract usurious upon its *face as matter of law* the deduction exercised in pursuance of the right did not render it usurious *as matter of fact.*

The evidence as to these transactions is introduced wholly by the complainant—the principal witnesses concerning them being James G. McLaughlin and Mathias Brakeley—both throughout at the centre of information. The former was Tuttle's accountant; and the entire detail of the account, the entries, correspondence, funds and vouchers passed through his hands. The fullness and accuracy of his evidence, sustained, as it is, by every entry in the account and every document relating to it, and more or less

by the other testimony—while it is in conflict with none of the other testimony—and relating to matters which extended over more than two years—and all before a dispute arose, entitle him to full credence.   M. Brakeley was from the date of the contract to November, 1861, Tuttle's general agent, supervising the business at New York.   He was a brother of the other Brakeleys, and therefore cannot be supposed to have testified too strongly against them.

Joseph Brakeley resided with Matthias at New York, and made his headquarters at Tuttle's office, passing much of his time at the latter at New York, representing his firm in the detail of the operations under the contract; had constant access to the complainant's books and papers; and would necessarily be a source of information to the witnesses.

The answers claim that the complainant violated the contract in several particulars and terminated it at an early date; that the stock belonged to them; and that they made due shipments of leather to the complainant.   These matters were passed upon by the decree of the September term, 1862, and in favor of the complainant.   The bill charges fraud in admixture and deployment of the complainant's stock, and asks relief accordingly.   The answers meet these charges by the theory that the complainant had no title in the stock.   In deciding that the complainant was entitled to the relief prayed for—that there were due and returnable to him under the contract at commencement of suit 10,531 hides—less the 200—shipped between suit and service of injunction—and to maintain the injunction; the circuit court passed upon the whole subject of breaches on the part of the defendants.   There is no assignment of error in the decree as to the alleged breaches and determination of the contract by the complainant—as to the return of leather, or any of the alleged breaches on the part of the defendants—and in these particulars the decree stands as correct and these matters are here conceded by the appellants.   As to the title, the third specification under the first assignment of error, objects to the equity side of the

circuit court as a proper tribunal for the trial of the title; not that the decree below as to the title was erroneous provided the title was properly triable in equity. Therefore, the question of title is not an open one on this appeal except as an element in the question of usury and except so far as it may be involved in the last assignment of error, but not as a separate and independent question.

3. As to unconscionableness:

(1.) The question is not presented by the answers. It is not raised as one of law by the demurrer, as that is in terms limited to specific grounds, not embracing this one; it is not and cannot be tendered as an issue of fact, the question being purely of law, arising on the face of the contract. It does not arise under the motion to dissolve.— 1. (4) a. page 18, supra. If it does:

(2.) Inadequacy of consideration or exhorbitancy of terms or hardness and unreasonableness does not render a contract unconscionable. It must be *so* one-sided as to be opposed to the general conscience; but need not be fraudulent. Equity may then in its discretion refuse relief to the party towards whom the contract inclines, leaving him to his remedies at law: the contract not being void at law.— This is because the Court of Equity as a court of conscience, will not encourage contracts against conscience. But the unconscionableness must *unmistakably* exist—the fact of its existence must not be a matter of doubt—much less be founded in speculations as to the effect of the contract.— This discretion, if exercised against the claimant, is open to revision, for it may have been unduly exercised, depriving him of an appropriate remedy. Its refusal to exercise the power is no ground for revision, for it involves no error against the other side. Unconscionableness does not work invalidity, and the discretion is exercised, if at all, out of regard to the dignity of the Court, and to discourage like cases.

1 Story E. Ju., sec. 331, 7 ed.; 1 Vernon 167, 211, *Nott* vs. *Hill;* 2 Vernon 26, *Nott* vs. *Hill;* 2 Vesey 137, 145, 148, 154, 155, 158, *Chesterfield* vs. *Janssen;* 2 Vernon 14, *Barry*

vs. *Pitt;* 1 Pierre Will., 117, *Twisleton* vs. *Griffith;* 3 Pierre Will., 290, *Cole* vs. *Gibbons;* 3 Ves. and Bea., 117, *Bowers* vs. *Heaps;* 1 Bro. Ch., 1, *Gwynn* vs. *Heaton;* 2 Bligh N. Series—106, *Collins* vs. *Hare;* 1 Levin 111, *James* vs. *Morgan;* 1 Atk., 351—2; 3 Bligh 1, *Whalley* vs. *Whalley.*

This proposition in the abstract and its general form is true; but in its application is qualified. If the exacting party has not changed his position in consequence of the contract, and seeks a specific performance, as (for instance) of a contract of purchase, equity may decline to aid him.— But, if he has performed more or less upon his part, and the other party has thus received benefit under the contract, especially if he has violated the contract, equity will grant relief, if in other respects the case is a proper one for relief. The general principle is so limited in application, else the principle itself would become an encouragement of wrong. Equity out of respect for conscience will never aid a wrong-doer under a contract in the commission of the wrong.

*A fortiori* the limitation applies *in a case of trust.* Still further it applies where there is no remedy at law. Here the Brakeleys are insolvent—and a judgment *in personem* would be worthless. *The property must be rescued* by a proceeding *in rem.* Neither the action of replevin nor any kindred action prevails in this State. Hence the only remedy is in equity. This bill seeks—not a specific performance—but by an injunction and receivership that the property be taken from the agents: the tannage completed— and the account adjusted and closed.

But the contract was not unconscionable.

The arrangement of a fixed return to the principal: and of an unlimited and contingent one to the agents, rendered their profits speculative and doubtful: and an unsuccessful result would no more enable them to throw up the contract, than a successful result would justify him in throwing it up.

Again: note the division of labor and risk. They were to tan, he to sell. If he bought, he got no more. If they bought, it was a privilege, that carried its equivalent with

it, for being experienced tanners, and confident in their skill, they would naturally prefer to do the buying—for as the success of the enterprise must·begin with the selection of stock—and might depend upon it, buying themselves gave to them the sense of better assurance of a successful result. *Practically* he would not *personally* buy—if they did not: it would still be done by some other agent—and he must in either case do all the work, which consists in keeping up and supervising the supplies. If they bought, that would increase their work: but not diminish his. Therefore it cannot be said as a matter of law that the contract is unconscionable.

Experienced in the knowledge of all the subject matter of the contract, its advantages and risks, the defendants made it; at the end of a year or more renewed and extended it as to time and magnitude—received profits under it —dropped no hint before suit against it—and in preparing their sworn answers were still silent on this subject—and the objection of unconscionableness is first raised, if at all, under the motion to dissolve—which gives to this ground of defence much of the character of after-thought. One of two conclusions follows—either that the agents did not regard the contract as unconscionable, or that, if they did so regard it, they accepted and adhered to it, to consummate fraudulent designs against the principal. The theory of the defence is now explained. It was fabricated, to justify the conduct of the agents upon the assumption of title in themselves: or to shield by recrimination, if this assumption of title should not succeed. The errors assigned in respect to jurisdiction: also that the cause was prematurely heard below; and that the Bank and others were not made parties, require no notice.

5. The 4th assignment of error is that the decree embraced all the hides on hand and in process of tanning at the tannery when the injunction was issued, thus including some 1,500–1,600 hides claimed by the appellants to have been received there after August 16, 1860, the point being that some 1500–1600 should have been omitted as belong-

ing to the Brakeleys, not having passed into his title either by the agreement of the agents or by the legal effect of their acts.

(1.) What aspect does the proposition take? The fact is established that they were accountable to him the 9th day of February, 1861, the date of the order of injunction—for

| | |
|---|---:|
| Sides, - - - - - - - - | 10,531 |
| Returned, February 11, 1868, - - - - | 200 |
| | 10,331 |
| Up to this it has been supposed that they had in hand to show for this amount, - - - | 7,937 |
| Leaving the deficit in sides, - - - - | 2,394 |
| "    "    "  " cash, at $4.00 a hide, - | $9,576 |

According to the proposition involved in this 4th assignment of error, they have in hand to show for the amount then due to him—say 1,500 hides to be taken out of the decree—

| | |
|---|---:|
| Sides, - - - - - - - - | 4,937 |
| Leaving the deficit in sides, - - - - | 5,394 |
| "    "    "  " cash, at $4.00 a side, - - | $21,576 |

In other words, that they defrauded him in the latter, not in the former sum.

Rather than give way to so flagrant a wrong, equity will, if need be, strain itself to find some rule of evidence or principle of equity to frustrate the wrong.

(2.) What evidence is there that they were not Tuttles?

If the Brakeleys converted his leather or acceptances, and the property can be traced in its new form, he is entitled to the new property the same as if the property was in its original form and at its enhanced value, if any; and to this end equity will, the fact of perversion once discovered, construe the indicia of fraud strongly against the wrong-doer. It will at once lean to the protection of the principal and discourage the fraud of the agent.

2 Kent Com., 452–3; 3 Johns. Rep., 348, *Betts and Church* vs. *Lee*; 21 Barb., 92, *Hyde* vs. *Cookson;* 32 Maine, 404, *Pulcifer* vs. *Paige;* 3 Comstock., 379, *Salsbury* vs. *McCook;*

7 Com., 59, *Brown* vs. *Saxe & Kimball;* 5 Wen., 505, *Baker* vs. *Wheeler & Martin.*

There is *prima facia* evidence that these hides—so alleged to have been received at the tannery after August 16, 1860 —came from Tuttle's property.

(3.) But, assuming that the hides did belong to the Brakeleys when they reached the tannery, they so intermixed and confused them with Tuttle's hides, as to make them his. In case of a wrongful intermixture and confusion of personal property, the owner of the part against whom the wrong is practiced takes the whole, unless the wrong-doer can separate the parts either by physical identity or by valuation, and in the latter case so as to give to the other his original value, the burden being on the wrong-doer to furnish the court with a clear and safe criterion. This is the milder doctrine. The stricter doctrine—and one more true to principle is the rule without the qualification—ignores the qualification; and because the law both prevents the wrong-doer from profiting by his wrong, and, having committed it, refuses to relieve him from its consequences. There is no evidence tending to furnish the court with any criterion for a severance, either physically or by valuation. The "1500 *to* 1600 *hides,*" went into process, if at all, without ear mark: and it was fully and candidly admitted before the court, by the counsel for the appeal in the closing argument, that there is *no* way by which they can be physically identified and separated from the rest of the stock. Is there any way of effecting a severance by valuation, returning to the agents *simply* in value the leather from the last mentioned hides? To return to them *any more, however small the amount,* is beyond the power of the court. Its justice towards them must be *exact*—not approximate; not a matter of estimate— not a rough exercise of justice. To deduct any from Tuttle's portion, however little, would violate the principle. It was also fully and candidly admitted by the counsel for the appeal in that argument, that there was *no* way of determining how the average quality or market value of those hides, or of the leather from them compared with the rest

of the stock embraced in the injunction. · A comparison of the qualities or values would be purely conjectural with nothing to guide the judgment.

The bill sets forth the uniform custom among tanners of the use of various modes for discriminating between stocks of different owners: and the existence of the custom imposed upon the appellants the duty of ordinary diligence in observing it. It sets up the fact of intermixture and confusion: that this intermixture of what they called their's with the complainant's had been going on since the previous summer, and discrimination had become impossible: that the complainant first ascertained this fact of the practice of intermixture from Asher B. on the 16th day of January, on the occasion of a visit at the tannery made for the express purpose of getting an explanation of the delays in · the returns of leather. The legal effect of the fact is that intermixed stock became his—that the 1500–1600 hides are his: and under the special and general prayer of the bill he may hold it—and it was therefore properly covered by the injunction and decree. The answers claim that the Brakeleys were tanning other hides than the contract hides "*during the entire time that they have been engaged in carrying on their tannery;*" and that "*they have no knowledge of any custom or practice among tanners of distinguishing hides in the process of tanning belonging to different owners: that they have no knowledge on the subject:* that the complainant well knew that no such mode of *identification was pursued or practised by them.*" In other words that they made no attempt at distinction; habitually intermixed and confused, accounting, if at all, by quantities without reference to identity: therefore that these "1500–1600" hides were admixed and confused with the Tuttle stock. The receiver, an experienced tanner, reports that he had no means of making a discrimination. It is admitted that the complainant was at the Tannery on this occasion, and it is not denied that it was for the purpose stated by him: this practice of·intermixture would almost necessarily come out: finding that it was out, the agent, Asher B., would be very likely to assume to treat it

lightly—as something "*not material.*" We have then no difficulty in believing that he made the very admission as to intermixture and confusion, that the complainant attributes to him.

*We have then these two established facts—that the Tuttle hides were in process of tanning down to the injunction; and that the "1500–1600 hides" were intermixed with them..*

Were the agents owners of said hides, there is no evidence by which a severance can be made. The Brakeleys knew of the order of receivership: that it required the receiver to discriminate, if practicable, between stock put in before August from stock put in after August, 1860: they with Heckman were present when he took possession under the order: and were bound to point out to him the distinction, if there was any, and to furnish the court with corresponding proof. They and Heckman then represented to the receiver that certain vats contained leather put into process after September, 1860. 2 Ves. & Beam., 263, *Attorney General* vs. *Fullerton;* 2 John. ch. 63—108, *Hart* vs. *Ten Eyke and others;* 15 Vesey, 432, *Lupton* vs. *White;* 2 Bl. Com., 404–5; 2 Kent Com., 364–5; 1 Robinson, 208, *case of the Odin;* 2 Blackf. Ind., 377, *Brackenridge* vs. *Holland;* 21 Pic., 298, *Ryder* vs. *Hathaway;* 11 Metc., 493, *Willard* vs. *Rice and others;* Story on Bail, § 40; 1 Story's E. Ju., § 423; 30 Maine, 237, *Hesseltine* vs. *Stockwell*—same doctrine as to mill logs; 1 Harr. and Gill., 11, *Ringgold* vs. *Ringgold et al.*—applied in chancery to Trustees; 30 Maine, 295, *Bryant* vs. *Ware;* 30 Maine, 370, *Dillingham* vs. *Smith.*

(3.) Furthermore, Asher Brakeley *agreed* with Tuttle on this 16th day of January that all the stock then in the tannery should be considered and treated as his for the purposes of the contract. If the conversation, which is set forth in the bill as having transpired at this time, *is to be believed,* such was the agreement.

Tuttle came from New York with his suspicions aroused: he found on reaching the tannery that the excuse for not making the anticipated returns was false—that his agents during the greater period of the contract had been using

his stock as a general capital in their business: and that there was then at the tannery, at Asher Brakeley's own estimate, but little more than his, Tuttle's complement. Upon making this discovery, it is altogether improbable that he would have returned satisfied with the "promise to continue making consignments," as set up in the answers, assuming that "*consignments*" meant merely "*shipments*" or "*returns*." It cannot be rationally conceived that the complainant would have turned away at the close of so remarkable an interview, and have delayed a resort to an injunction, had there been left upon his mind a doubt as to the proposed willingness of the agents to hold the remaining stock first for his benefit. He would have stultified himself by so doing.

It is equally improbable that he would have left them satisfied with less than an understanding that he should have what indisputably belonged to him. Nor can it reasonably be supposed that an agent, then detected in his guilty practices, would have hesitated to promise, however insincerely, to devote the stock first to the claim of his principal—to have given some assurance calculated to satisfy his principal. The latter must have returned to New York satisfied in some way.

*Again:* the answers admit that at this time a conversation took place between him and Asher on the subject, charges his version of it as a perversion: yet entirely omit to state what the real conversation was, assuming his version to be untrue. Had the answers *denied* that *any* conversation took place on the subject, they would have been perfect as a traverse. *Admitting* that a conversation took place: being interrogated as to its particulars: denying the conversation charged: withholding the conversation alleged: withholds the fact, that should have been put before the court, that it might be seen whether the denial was true or not, and that the discovery sought might be furnished: and instead forces upon the court the defendant's construction of certain evidence in the place of evidence. The answers therefore at this part are evasive: and equivalent to a refusal to an-

swer the charge or interrogatory and must stand as an ad-mission of the interview as charged.   The rule on this sub-ject is clear—and its necessity obvious.   1 Foster (N. H.), 29, *Tucker* vs. *Cheshire R. R. Co.*

"An answer which omits to state any matter called for by the bill, and material to the complainants' case, although the bill contains no special interrogatory thereon, is insuffi-cient."   2 Ind. Ch. Decis., 190, *Wooster* vs. *Burch.*

"It is not sufficient that an answer contains general de-nial of the matters charged in the bill, but there must be an answer to the sifting inquiries upon the general subject, and wherever there are particular and precise charges, they must be answered particularly and precisely, though the general answer may amount to a full denial of the charges.

The answer should in general be full to all the interroga-tories founded on the matters charged in the bill unless they are clearly immaterial; and some writers say, that the general rule requires the defendant to answer every ques-tion, without reference to whether it is or is not immateri-al."   10 Geo., 208, *Lee* vs. *Baldwin.*

"The answer of a defendant to a bill in chancery is ev-idence for him, so far only as it is responsive to the call of the bill for discovery of facts alleged therein, or necessarily connected with the responsive matter or explanatory of it." 16 Geo., 442; *Pitts* vs. *Hooper; Jordan* vs. *Jordan.*

"An answer to a bill must be a full, true and direct re-sponse, to all and singular, the several matters contained in the bill, according to the best and utmost of the defendant's knowledge, recollection, information and belief, and that as fully and particularly as if there were interrogatories pro-pounded on each separate matter."   15 Ark., 184; *Hardy* vs. *Hardy.*

"Where a bill in chancery charges a fact to be within the knowledge of the defendant, which may fairly be pre-sumed to be so, or without so charging the fact may be said to be reasonably within his knowledge; if the answer is silent as to that fact or evades it, it is an implied admis-

sion of the fact thus stated, and no further proof is necessary to warrant a decree against the defendant upon it."

1 Johns. Chancery Rep., 65, *Methodist Church et al.* vs. *Jaques et al.*, "If a defendant submits to answer a bill of discovery, &c., he must answer fully."

"A defendant is bound in his answer to admit or deny all the facts stated in the bill, with all their material circumstances, without any special interrogatories in the bill for that purpose." 28 Ala., 289, *Grady* vs. *Robinson;* 4 Iowa, 577, *Compton* vs. *Comer;* 31 Penn. State Rep., 387, *Pasey* vs. *Wright;* 24 Geo., 583, *Sanderlin* vs. *Sanderlin;* 5 R. I., 479, *Atlantic Fire and Marine Ins. Co.* vs. *Wilson;* 31 Ala., 175, *Ledbetter* vs. *Walker;* 8 Cal., 145, *Dewey* vs. *Bowman;* 9 Rich. Eq. (S. C.), 19, *Ellis* vs. *Woods;* 7 Ind., 661, *Spring* vs. *Frazer;* 24 Vt. (Deane), 70, *Gates* vs. *Adams;* 2 Foster (N. H.), 535, *Dinsmore* vs. *Hazleton;* 2 Halst. Chancery Rep., *Kinneman* vs. *Henry;* 3 Ib., 227, *Doughty* vs. *Doughty;* 2 Eng., 536, *Hill* vs. *Crary;* 8 Geo., 516, *Carey* vs. *Jones;* 13 Geo., 140, *Swift* vs. *Swift;* 21 Eng. Law & Eq., 48, *Patrick* vs. *Blackwell;* 7 Foster (N. H.), 440, *Miles* vs. *Miles;* 2 Paige, 105, *Davis et al.* vs. *Mapes et al.;* 3 Paige 606, *Mechanics' Bank* vs. *Lery;* 3 Paige, 186, *Cuyler* vs. *Bogert;* 3 Paige, 210, *Utica Ins. Co.* vs. *Lynch;* 11 Paige 236, *King* vs. *Ray;* 1 Johns. Chancery Rep., 103, *Woods* vs. *Morrell et als.;* 1 Johns. Chancery Rep., 302, *Frost et al.* vs. *Beekman;* 13 Ill., 318, *Chambers* vs. *Warren.*

"If an answer to a bill of discovery is not strictly responsive, exception should be taken to it on trial, and the tribunal which hears the case should exclude such parts of the answer as *are not responsive.*"

But, treating the answer as a proper denial in its structure to the part in question of the bill, it is unworthy of credit, the answer having been impeached in other parts. 32 Ala., 427, *Prout* vs. *Roberts;* 21 Ib., 633, *Gunn* vs. *Brantley.*

And upon the same rule averments of the bill on other points having been sustained in the proof, is to be believed on this point.

The complainant's version of the interview at the tannery on the 16th of January must therefore be adopted.

5. Defendants having replaced in the tannery other hides after the deployment of a greater quantity must be treated as having *intended* thereby to restore, and equity will so construe the matter in the absence of controlling evidence. If a special deposit of bullion, specie or bills is made with a broker, and he from time to time takes out for his own use, and from time to time puts back again like property, would this not be restoration by him? else why put back? The act is such as would result from an intention to restore—therefore reflects the intention itself. Equity will surely seize in such a case upon that construction of his conduct, which is most consonant with the idea of returning good faith on the part of the agent and with reparation to the principal; and will not permit the former subsequently to repudiate this as the character of his act while reparation is due.

MAXWELL, J.    The bill was demurred to on three grounds.

1st. Because the contract or contracts set forth in said bill are upon their face contrary to the statutes of Virginia and New York against taking illegal interest, and are usurious and void under the laws of both States.

2d. Because said bill seeks to enforce in effect the specific execution of alleged personal contracts in regard to personalty.

3d. Because it seeks to recover damages in equity for the alleged breach or breaches of such personalty contracts and for the conversion of personal property for which there is a remedy at law.

In answer to the first ground of demurrer, the contract is not upon its face usurious.    The agreement for the advance and loan of money is only part of the contract, and it is a question of fact whether usury was intended or not.    *Smith* vs. *Marvin*, 27 New York Rep., 137.

In answer to the second and third causes of demurrer the bill is not to enforce the specific execution of a contract for

personalty, nor to recover damages for the breach of a contract for the purchase of personalty, or for the conversion of personal property, but it is to restrain the defendants, who are in substance alleged to be insolvent, from fraudulently converting to their own use the property of the complainant, and for an account. Upon the facts as charged in the bill there is no remedy at law, and the only complete remedy is in chancery in the form of the proceeding in this case. *Walker* vs. *Hunt*, 2 W. Va. Rep.; *Watson* vs. *Southerland*, 5 Wallace, 74; 1 Story's Equity Jurisprudence, sections 80, 457, 623; 2 *Ibid*, sections 845, 846, 905, 906, 907.

For these reasons I think the demurrer was not well taken.

The next question is, was the transaction usurious in fact?

The Brakeleys in their answer charge that the substance and effect of the contracts set forth by the complainant, are but to provide for advances or loans of money to them, and devices or contrivances to reserve and secure to the complainant unlawful and usurious interest and profits, *and that the said contract or contracts were for the payment of interest at a greater rate than is allowed by law*.

The Code of Virginia, chap. 141, sec. 6, provides that, "any defendant may plead in general terms that the contract or assurance on which the action is brought was for the payment of interest at a greater rate than is allowed by law, to which plea the plaintiff shall reply generally, but may give in evidence upon the issue made up thereon, any matter which could be given in evidence under a special replication. Under the plea aforesaid the defendant may give in evidence any fact showing or tending to show that the contract or assurance, or other writing upon which the action was brought, was for an usurious consideration." The charge of usury in the answer is in the precise language of the law, to which the complainant replied generally, thus raising an issue of fact on the question of usury in precise conformity to the law of this State.

This answer would not be sufficient to raise the question in the courts of New York, according to the authority of

the case of the *New Orleans Gas Light and Banking Co.* vs. *Dudley and others*, 8 Paige, 452.

The contract in the case was made in New York, and as to its nature, construction and validity, is to be governed by the laws of that State, but the form of the remedy and mode of proceeding must be regulated solely and exclusively by the laws of this State, the place where the suit is brought, to enforce the contract. The issue made, then, by the answer and replication, fully raises the question of fact as to whether the contract was founded on a usurious consideration or not. What the laws of New York are on the subject of usury is a fact agreed in this case. According to those laws all bonds, bills, notes, assurances, conveyances, all other contracts or securities whatsoever, and all deposits of goods or other things whatsoever, whereupon or whereby there shall be reserved or taken or secured or agreed to be reserved or taken, directly or indirectly, any greater sum or greater value for the loan or forbearance of any money, goods or things in action, than at the rate of seven per centum per annum shall be void.

This is substantially the same as the statute of Virginia, on the same subject, which is the law of this State, except that by the Virginia statute interest is at the rate of six per centum per annum, and both the New York statute and the Virginia statute are in substance the same as the English statute of the 12th of Ann, except that by the statute of the 12th of Ann interest was at the rate of five per centum per annum. The statute of the 12th of Ann only differs from the older English statutes in the rate of interest. I have made this comparison of these statutes because decisions of the English courts, of the courts of New York and of Virginia have been cited in the argument of this case to explain the meaning and construction of the New York statute.

In the case of *Cotton* vs. *Dunham*, 2 Paige, 272, a New York case, the chancellor uses the following language: "The English as well as the American reports are filled with cases arising out of the various devices and expedients which have been adopted to evade the provisions of the

statutes to limit the rate of interest to be received in the loan or forbearance of money. But on examination it will be found there is a uniform and settled principle running through all these cases with scarcely any exception. Wherever by the agreement of the parties a premium or profit beyond the legal rate of interest for a loan or advance of money is, either directly or indirectly, secured to the lender, it is a violation of the statute unless the loan or advance is attended with some contingent circumstances by which the principal is put in evident hazard. A contingency merely nominal attended with little or no hazard to the principal of the money loaned or advanced, cannot alter the legal effect of the transaction; and the risk of loss by the death or insolvency of the borrower is not such a contingency or hazard as will take the case out of the operation of the statute. That is the ordinary risk which every man runs who lends money on personal security only, and if the contingency of the borrower's dying insolvent was to be deemed a hazard of the principal or money lent, the statute of usury would be a dead letter. Where there is a negotiation for a loan or advance of money and the borrower agrees to return the amount advanced at all events, it is a contract of lending within the spirit and meaning of the statute, and whatsoever shape or disguise the transaction may assume if a profit beyond the legal rate of interest is to be made out of the necessities or improvidences of the borrower or otherwise, the contract is usurious."

In the case of *Cleveland* vs. *Loden & Draper*, 7 Paige, 557, a New York case, the chancellor uses this language: "Whenever the lender stipulates even for the chance of an advantage beyond the legal interest the contract is usurious, if he is entitled by the contract to have the money lent at all events."

In the case of *Flayer* vs. *Edwards*, 1 Cow., 112, an English case, under the statute 12th Ann, Lord Mansfield said: "This is on the original contract by which the payment of the principal is stipulated, and, therefore, if it is within the statute of usury at all the contract itself is void. It depends

principally upon the contract being a loan; and the statute uses the words 'directly or indirectly.' Therefore, in all questions, in whatever respect repugnant to the statute, we must get at the nature and substance of the transaction; the view of the parties must be ascertained to satisfy the court that there is a loan and borrowing, and that the substance was to borrow on the one part and to lend on the other; and where the truth is a loan of money the wit of man cannot find a shift to take it out of the statute. If the substance is a loan of money nothing will protect the taking more than five *per centum*."

In the case of *Powell* vs. *Waters*, 8 Cowen, 696, the court undertakes to state certain principles which are claimed to be established beyond controversy, and proceeds to state among other things, "that the mere giving and receiving *designedly* more than at the rate of seven per centum per annum for interest is usury, although there be no corrupt agreement other than that which is manifested by one party allowing and the other receiving the unlawful interest.

The following cases are upon the principles of the four cases above:

*Morse* vs. *Wilson*, 4 T. R., 353; *Barnard* vs. *Young*, 17 Ves., 44; *Dunham* vs. *Dey*, 13 Johns., 44; *Gibson* vs. *Fristoe and others*, 1 Call., 73; *Dunham* vs. *Gould*, 16 Johns., 367; *Watkins* vs. *Taylor*, 2 Munf., 429; *Steptoe's adm'r* vs. *Harvey's ex'rs*, 7 Leigh, 523; *Roberts* vs. *Trenayne*, 3 Croke, 507; *Steele* vs. *Whipple*, 21 Wend., 103; *The Dry Dock Bank* vs. *The American Life Insurance Trust Company, &c.*, 3 Com., 344.

No case has been cited that is not perfectly consistent with all the foregoing cases.

The case of *Gilpin* vs. *Enderberry*, 7 Eng. C. L. R., 314, claimed to be inconsistent with them, is in perfect harmony with them. In this case there had been a plea of usury which was negatived by the verdict of a jury, and the court merely held that it would not go behind the verdict of the jury.

The cases of *Smith* vs. *Marvin*, 27 New York, 137; *Trotter* vs. *Curtis*, 19 Johns., 160, and *Suydam* vs. *Niston*, 4 Hill, 211,

are cited to prove that a premium at a greater rate than allowed by law may be received on money advanced without constituting usury. In these cases the primary object of the contract was not a loan of money. The borrowers were to draw on the parties who were to advance the money on time and were to meet the drafts at maturity with their own money or consignments of produce. If this was not done the parties on whom the drafts were made were to. pay them and to charge a commission greater than legal interest.

These contracts are not usurious because the commission is not to be charged unless the makers of the draft fail to meet them, which they may do or not at their option and not at the option of the parties who were to advance the money. The cases are all consistent with the principle of the cases first referred to. Even in this class of cases it would be a question of fact whether usury is intended or not.

If the contract in the case under consideration is in substance for a loan of money at a greater premium than at the rate of seven per centum per annum the contract is usurious and void, no matter what its form is.

Under the agreement for the purchase of hides, the hides were to be purchased by the Brakeleys or by Tuttle, and for all purchased by the Brakeleys Tuttle was to accept their drafts at three months from the date of the purchase, and Tuttle was to have five per centum commission or advance on the cost of the hides, whether purchased by himself or by the Brakeleys. Tuttle was also to have interest on the cost of the hides from the time of payment, including as part of the cost the said commission. There is a stipulation in the contract that all the hides purchased are to be the property of Tuttle, and when tanned into leather are to be returned to him to be sold by him. It is also agreed that if from mismanagement or otherwise the leather thus returned should fail to realize the cost, charges, &c., as specified, that the Brakeleys will pay over, without any delay, any and all such deficiency, as soon as ascertained, to Tuttle. The hides and

leather were to be kept insured at the expense of the Brakeleys.

According to the very terms of this contract Tuttle was to receive without any risk whatever on his part, except the risk of the death or insolvency of the Brakeleys, the principal sum advanced by him and a commission of five per cent. on such principal sum, with interest on the aggregate of such principal and commission at the rate of seven per centum per annum. What was the consideration for this five per cent. commission when viewed in the light of the facts proved in the case? What services did Tuttle render the Brakeleys for which they should allow it to him? According to the terms of the contract all of the hides might have been purchased by Tuttle, and if they had been so purchased there might be some reason to say that the five per cent. was to compensate him for buying them; but the facts show that of the 10,154 hides purchased under the contract Tuttle only purchased 801 and the Brakeleys purchased all the others. I have looked in vain into the evidence in this case to find any consideration for the commission except the advance of the money by Tuttle to the Brakeleys, for which they are charged, in addition to the commission, interest at the rate of seven per centum per annum. From the terms of the contract itself as explained by the facts proved in the case, it is clear beyond a reasonable doubt that the transaction was intended to be for a loan of money on which was reserved a greater sum than at the rate of seven per centum per annum.

The contract is therefore void.

I cannot see that any error was committed by the court in hearing the case before it was formally set for hearing, as no objection was made at the time, when the defendants were present in court and might then have made the objection.

Nor do I think there is any error in failing to make the Cumberland Bank and other parties defendants, because all the interest which they appear to have in the subject matter of the suit was acquired after the suit was instituted.

I think by the terms of the contract, if not void for usury, the title to the hides and leather would have been in Tuttle, and that the defendants by mixing their 1,526 hides with those belonging to Tuttle, would have made them the property of Tuttle until and unless they could be separated and distinguished from those belonging to Tuttle, which it appears from the evidence was not and could not be done. There could, therefore, be no error in decreeing them to be the property of Tuttle, if the contract had not been void for usury.

Upon the whole case, however, I am clearly of the opinion that the decree complained of must be reversed, with costs to the appellants, because the contract is usurious, and this court proceeding to render such decree as the court below ought to have rendered, should dissolve the injunction, and as the case was ready for hearing on its merits, dismiss the bill with costs to the defendants below.

The President concurred.

DECREE REVERSED.

---

*Note by the Reporter.*

At a prior term, when this case was called for hearing, Judge Harrison, who had granted the appeal, retired from the bench, and the remaining judges, Berkshire and Brown, called a circuit court judge to the bench, when judge Berkshire, who had decided the cause below, retired, and the court as then composed called another circuit court judge to the bench.   The appellee then objected to the cause being heard by the court, alleging that as thus composed the court was liable to constitutional objections; but being overruled, he filed a protest with the papers, and made a motion to dismiss the appeal because it had been awarded by a judge who had been of counsel for the appellants in the court below, and that it was therefore improper for him to grant an appeal.

This latter motion was overruled.