JULIAN J. BEACH, *et ux.*, v. ANDREW KIRK

189 So. 263
Opinion Filed November 16, 1938
On Rehearing June 2, 1939

*Shipp, Evans & Kline, W. H. Burwell, Van C. Swearingen* and *Whitfield & Whitfield*, for Appellants;

*Roscoe Burnstetter* and *Fred H. Kirtley*, for Appellee.

PER CURIAM.—In this cause Mr. Chief Justice TERRELL, Mr. Justice WHITFIELD and Mr. Justice THOMAS are of the opinion that the decree of the Circuit Court should be reversed while Mr. Justice BROWN and Mr. Justice BUFORD and Mr. Justice CHAPMAN are of the opinion that the said decree should be affirmed. When the members of the Supreme Court, sitting six members in a body and after full consultation, it appears that the members of the Court are permanently and equally divided in opinion as to whether the decree should be affirmed or reversed and there is no prospect of an immediate change in the personnel of the

Court, the decree should be affirmed; therefore it is considered, ordered and adjudged under the authority of State, *ex rel.,* Hampton v. McClung, 47 Fla. 224, 37 So. R. 51, that the decree of the Circuit Court in this cause be and the same is hereby affirmed.

Affirmed.

TERRELL, C. J., and WHITFIELD, BROWN, BUFORD, CHAPMAN and THOMAS, J. J., concur.

CHAPMAN, J.—On December 26, 1935, plaintiffs filed in the Circuit Court of Dade County, Florida, their bill of complaint in the usual form to foreclose a mortgage on real estate located in said county, and sought a decree for the sum of $11,500.00 and accumulated and unpaid interest. An answer was filed alleging that the plaintiffs reserved the sum of $1,403.78 and the delivery of a note in the sum of $11,500.00 and a mortgage securing the same and that plaintiffs wilfully and knowingly charged, reserved and exacted a rate of interest greater than 10% per annum and that the penalties exacted therefor by Sections 6938 and 6939 C. G. L. and the decisions of this Court, doubles the amount of $5,198.49 wilfully charged, reserved, taken and collected of and from the defendant, and when credited as against the original indebtedness of $10,000.00 there remains due to the defendants the sum of $396.98 as a balance by the plaintiffs. The cause was referred to a Special Master, who heard the testimony adduced by the parties and reported his findings to the Chancellor below to the effect that the defendants failed to sustain the answer by the evidence as required by law and the report was ratified and confirmed by the Chancellor and a final decree was entered for the plaintiffs for the sum of $11,500.00 and interest, and an appeal was taken therefrom by the defendants to this Court. The parties hereto will be referred to in this

opinion as plaintiffs and defendants as they appeared in the court below.

It is contended by counsel for appellants that the evidence preponderates in their favor, and that it is clearly and fully established that the plaintiffs wilfully and knowingly charged, reserved and exacted $1,403.78 contrary to Section 6938, C. G. L., which legally amounts to usury and which is treated in their brief thusly:

"The soul and character of the usurer has been immortally portrayed by the pen of Shakespeare in his character of Shylock. Nothing can be added to it, nothing can be taken from it. It is the soul of the usurer stripped of all concealment, so loathsome and repulsive that all organized society has branded it as an outlaw. It is without human sympathy, and devoid of mercy. Under all decent civilized governments, its spirit in any contract blights the contract and condemns it as illegal and contrary to public policy. It has lived through the ages and it lives today in the heart and soul of those who would profit by the adversity of the unfortunate, taking advantage of their misfortunes to strip them clean without sympathy and without mercy.

*"To our knowledge, neither history, or tradition reveal a single case in which a usurer has ever yet admitted his transgression and accepted the penalty of his wrongdoing.*

"The spirit of the usurer that drives its bargain against its unfortunate victim never relents, but always demands the collection of its pound of flesh until stayed by the hand of the law. No field of human conduct has produced more varied and subtle schemes and devices to conceal the truth and prevent detection than have the activities of the usurer. To prove his motives and his purposes is often most difficult, sometimes impossible, and through the subtlety of the scheme devised, the usurer often escapes and his victim is

left stranded and without remedy. For this reason and in this common knowledge, our legislators, for generations, have sought to write and rewrite usury statutes broad enough and strong enough and clear enough to prevent the pernicious practice and to penalize the usurer. We believe that the statutes of Florida are no exception to this rule and that the scheme here concocted, as plainly revealed by this record, condemns the conduct of the appellee and demands of him the restoration provided in the statute."

The evidence shows that in November, 1928, the Dade County Security Company, then in process of liquidation, held mortgages of the defendants in the sum of $14,174.06 and that the mortgages had matured and the owner demanded payment. It offered the defendants to settle the mortgages for the sum of 50% in cash and the remaining amount of 50% to be paid with capital stock at par of the Security Company. The defendant, J. J. Beach, contacted Mr. Chase, a real estate agent of Miami, and agreed to pay him a fee if he would or could contact some person able and willing to refinance these mortgages. The agent Chase went to the plaintiff and after some little time he agreed to and did finance the mortgages held by the Security Company. The agent Chase represented J. J. Beach and not the plaintiffs. The closing of the loan was handled by the agent Chase and not the plaintiff, who at the time was sick at his home but was convalescing. He only signed the checks necessary to pay the Security Company's mortgages. He talked to the defendants but one time prior to making the loan. The Security Company's mortgages totaled $14,174.06 and the plaintiff advanced to the Security Company and the defendant the sum of $10,096.22 and received a note for the sum of $11,500.00 and the sum of $1,403.78 not received by defendant is accounted for thusly: The amount due the Security Company by defendants was

$14,174.06, and that the capital stock of the Security Company could be purchased on the market for around 42% of the par value, but when presented to the Security Company would be accepted at par value up to 50% plus 50% in cash for the payment of defendants' mortgages.

It is readily seen that the defendants would profit by this method by the difference between $10,096.22 advanced by the plaintiffs to the defendant and the sum of $14,174.06, the amount of the mortgages held by the Security Company. The amount claimed and asserted here as usury in the sum of $1,403.78 is the amount that the plaintiff was allowed to share as part of the savings to the defendants by the purchase of the capital stock of the Security Company. It cannot be overlooked that the defendants obtained the lion's share of this savings when it was accomplished by the use of the plaintiff's money. Hon. T. J. Dowdell, the Special Master appointed by the lower court to hear the evidence and to make findings, reported that the plaintiffs did *not* wilfully and knowingly charge, reserve or exact a rate of interest of more than 10% per annum as contemplated by Section 6938 C. G. L. The report was approved and confirmed.

It has been held by this Court that a defendant setting up the defense of usury had the burden of proof, which is the burden of proving the essential elements of usury. See Tucker v. Fouts, 73 Fla. 1215, 76 So. 130, L. R. A. 1917F 916; McCullough v. Hill, 105 Fla. 680, 133 So. 846; Phillips v. Lindsay, 102 Fla. 935, 136 So. 666.

In the case of Clark v. Grey, 101 Fla. 1058, 132 So. 832, this Court held:

" 'There must be a loan, express or implied; (2) an understanding between the parties that the money lent shall be returned; (3) that for such loan a greater rate of interest than is allowed by law shall be paid or agreed to be paid,

as the case may be; and (4) there must exist a corrupt intent to take more than the legal rate for the use of the money loaned.' Doster v. English, 152 N. C. 341, 67 S. E. 755.

" 'The corrupt intent mentioned in the books consists in the charging or receiving the excessive interest with the knowledge that it is prohibited by law and the purpose to violate it. Our statute makes it usury if the interest is knowingly charged or received at the unlawful rate.' " See Chandler v. Kendrick, 108 Fla. 450, 146 So. 551; Benson v. First Trust & Savings Bank, 105 Fla. 135, 134 So. 493; Jones v. Hammock, 131 Fla. 321, 179 So. 674.

The practice of the Chancellor in making findings of fact is not only commendable, but tends generally to facilitate the disposition of cases in the appellate Court. These findings serve as a ground for the proper conclusions to be reached. See Day v. Weadock, 101 Fla. 333, 134 So. 525. It has been held by an unbroken line of decisions of this Court that the findings of fact as made by a Chancellor will not be disturbed on appeal or review in this Court, unless the said findings are clearly erroneous. See Farrington v. Harrison, 95 Fla. 769, 116 So. 497; Atlantic Bank, etc., Co. v. Sengstak, 95 Fla. 606, 116 So. 267; Mock v. Thompson, 58 Fla. 477, 50 So. 673; Lucas v. Wade, 43 Fla. 419, 31 So. 231; Kent v. Knowles, 101 Fla. 1375, 133 So. 317.

We have given consideration to the entire record, examined carefully the briefs filed by counsel for the respective parties, heard arguments at the bar of this Court, and find no error in the record, and we feel that the decree appealed from should be affirmed. It is so ordered.

BROWN and BUFORD. J. J., concur.

TERRELL, C. J., and WHITFIELD and THOMAS, J. J., dissent.

## On Rehearing
### Division A

Buford, J.—Pursuant to argument on rehearing granted after entry of our judgment herein on November 16, 1938, the majority of the Court are of the opinion that the decree should be reversed. The complainant in the court below, defendant in error here, alleged in his bill of complaint, *inter alia*, the following:

"On or about the 20th day of November, 1928, the defendants, Julian J. Beach and Margaret F. Beach, approached the plaintiffs and to them represented that the Liquidator of Dade County Security had agreed (subject to the approval of this Court) to accept in full settlement of said mortgage indebtedness, amounting to $14,174.06, one-half of said amount in cash and one-half in stock of Dade County Security Company, which stock at the time aforesaid, could be purchased at a price considerably less than the par value thereof. The defendants further represented that they were able to finance neither the cash payment required, nor the purchase of the stock necessary to effect a settlement of said mortgage indebtedness upon the basis aforesaid, and they offered to give to the plaintiffs their promissory note for $11,500.00 secured by a mortgage which would be a first lien upon the property covered by the aforesaid three mortgages, which is the same property described in Item 1 in Paragraph 2 above, and also upon a tract of land consisting of 15 acres, which is described in Item 2 in Paragraph 2 above, provided, that the plaintiffs would deliver to the Liquidator the amount of cash and stock required to procure a satisfaction of the aforesaid three mortgages held by said Liquidator.

"Your Orators accepted the offer of said defendants and, thereafter, on December 11, 1928, said Liquidator was authorized by order of this Court in proceeding No. 22244-B

in Chancery, to accept in settlement and full payment of the aforesaid three mortgages, one-half of the aggregate amount thereof in cash, and one-half thereof in stock of said Dade County Security Company. Thereupon, your Orators purchased the requisite amount of stock and thereafter, to-wit: on December 27, 1928, your Orators delivered said stock and cash to said Liquidator and received therefor duly executed satisfactions of said mortgages together with the notes of said defendants secured thereby, which notes were duly cancelled and marked paid by said Liquidator. Your Orators thereupon delivered said cancelled notes and mortgage satisfactions to said defendants and in return received from said defendants their duly executed promissory note dated December 20, 1928, in the sum of $11,500.00. A true and correct copy of said promissory note is attached hereto, made a part hereof, and marked Exhibit No. 1. At the same time, in order to secure the payment of said $11,500.00 note, said defendants delivered to your Orators their mortgage deed which encumbered the property described in Paragraph 2 above. In and by said mortgage, said defendants covenanted with your Orators that they were the owners and in possession of said property; that they were indefeasibly seized of said real estate in fee simple and they warranted the title to same. A true and correct copy of said mortgage deed is attached hereto, made a part hereof, and marked Exhibit No. 2."

These allegations, in effect, alleged that Beach had the opportunity to settle an indebtedness of $14,174.06 for one-half of that amount, to-wit: $7,087.03 in cash, plus a like amount in capital stock of Dade County Security Company, and that Kirk agreed to furnish the money to Beach to make this settlement under condition that Beach execute and deliver this note and mortgage securing the same to

Kirk for the sum of $11,500.00; that the deal was carried through; the indebtedness to the Dade County Security Company paid off and discharged; that note was made to Kirk for the sum of $11,500.00 and secured by a mortgage embracing the same property that had been embraced in the Dade County Security Company mortgage, with an additional 15 acres of land.

The record shows conclusively that the amount of money furnished by Kirk to pay off the indebtedness to Dade County Security Company was the sum of $10,096.22 and that Kirk received from Beach his note and mortgage for $11,500.00 with interest from date at the rate of 8%. This note and mortgage clearly embraces the obligation on the part of Beach to pay Kirk a surplus or bonus of $1,403.78 which tainted and infected the transaction with usury as denounced by Section 4851 R. G. S., 6938 C. G. L.

On the trial Mr. Kirk testified in part as follows:

"Q. Mr. Kirk, what was the agreement you had relative to this mortgage and the three mortgages that Mr. and Mrs. Beach owed to the Dade County Security Company?

"A. That I was to furnish the cash.

"By Judge Evans: We object to it unless there was an agreement had with Mr. Beach.

'By the Master: Ruling reserved. Let him answer.

"A. That I was to furnish the cash to take care of Dade County Security Company's mortgage and in return for that I was to get a note and mortgage on some property.

"Q. You testified that two of these checks were for the purchase of stock in the Dade County Security Company; were you to furnish the stock or was it to be all cash?

"A. Stock and cash. They said 50/50, they could settle on a discount of about 50/50.

"Q. Did you purchase the stock?

"A. Yes.

"Q. And advanced the cash necessary to whom?

"A. My recollection is that that check was made to me and endorsed to Dade County Security Company.

"Q. Are you referring to the check for $7,087.03?

"A. I believe that is the check, yes.

"Q. And was that used for cash to the Dade County Security Company or for the purchase of stock?

"A. That was cash.

"Q. Then there was one check for $2,406.07 and another for $603.12; were those checks for cash or for stock?

"A. I believe for stock $2,406.07 and $603.12 were for Dade County stock.

"Q. In return for this stock and this cash, what were you to get?

"A. A mortgage on some property held by Mr. and Mrs. Beach and a note for $11,500.

"Q. That is the note and mortgage being foreclosed in this transaction?

"A. Yes.

Mr. Kirk also testified as follows:

"Q. Mr. Kirk, did you not state to Mr. Beach that you would loan him $10,000, but that you would require him to give you a mortgage and a note for $11,500?

"A. No sir.

"Q. How did you arrive at the figure for $11,500?

"A. That was the amount that was stated if I would buy this stock, Mr. Chase's statement that he would give $11,500 if I would buy this stock and settle up the Dade County Security Company.

"Q. You and Mr. Beach then in your conversation agreed that it would require $11,500 to buy up the Dade County Security Company stock?

"A. No sir.

"Q. How did you arrive at this amount?

"A. About $10,000 the stock was fluctuating every day.

"Q. Why was the $1,500 added to the note?

"A. Merely dividing up the profits I suppose, discharging a $14,000 debt.

"Q. You were to profit $1,500 by the transaction?

"A. Yes, if the note had been paid.

"Q. Only $10,000 was to be used to pay to Dade County?

"A. It was $10,096.

"Q. All right, the balance of it represented a profit to you of the difference between $11,500 and $10,096.00 represented profit you were to make on the transaction?

"A. Understand I didn't want to go through with the deal. In fact I had to borrow the money to go through with it.

"Q. You borrowed the money you say to make the loan?

"A. Yes sir, I did.

"Q. $10,000?

"A. Yes, from Atlantic National Bank of Boston.

"Q. You borrowed $10,000 to go through with the deal?

"A. Yes.

"Q. The reason you borrowed it, you saw an opportunity to make $1,500?

"A. No, I had given my word that I would.

"Q. Given who your word?

"A. Mr. Chase, which I suppose he conveyed to Mr. Beach.

"Q. Now Mr. Beach came to you and was alone, not accompanied by Mr. Chase?

"A. I don't think so. I think Mr. Chase was there at any interview.

"Q. Now, Mr. Kirk, didn't you testify at the time of the conversation between you and Mr. Beach that Mr. Chase was not present?

"A. I don't think so.

"Q. Did you say that?

"A. No.

"Q. What do you say now; was Mr. Chase present or not?

"A. My recollection is not clear about that.

"Q. Now at the time you had the conversation with Mr. Beach, did you tell him that you would loan him more than $10,000?

"A. No sir.

"Q. How much did you tell him you would loan?

"A. The conversation came from Mr. Chase as to that.

"Q. I am talking about the conversation with Mr. Beach.

"A. I don't recall that.

"Q. But you do recall that Mr. Beach told you he wanted to borrow $10,000?

"A. I don't recall that conversation. I do recall the amount was about $10,000 needed to take care of Dade County Security deal.

"Q. On the 26th of December, that it the very day that this transaction was closed up, wasn't it?

"A. I think so.

"Q. And you can't remember whether you were present or not?

"A. No, I can't.

"Q. When did you give this check to the Dade County Security Company?

"A. I couldn't tell you that.

"Q. It is dated December 26th; did you give it on that same day?

"A. I couldn't say. I told you my recollection is not very clear.

"Q. When did you turn over this certified check for $2,406.07 to the Dade County Security Company?

"A. I think the transaction all occurred on the same day.

"Q. And that is the same day that the mortgages were satisfied, isn't it? To refresh your memory, I will show you one of them.

"A. December 26th, yes sir."

The record shows that both Beach and Kirk were men of wide business experience. They both understood that the transaction contemplated that Kirk should receive from Beach in addition to the money advanced and interest thereon the sum of $1,403.78, which represented that much of what Beach would save by making the compromise settlement with Dade Security Company. That Kirk understood this is clearly shown from his testimony above quoted. It is, therefore, indisputable that Kirk knew that under the agreement that by the "contract, contrivance or devise * * *" the debtor is required or obliged to pay a sum of money greater than the actual principal sum received together with interest at the rate of 10%."

The record also shows that this was not only the intention of Kirk at the time the contract was made but that intention was pressed and pursued in the bill for foreclosure and throughout the trial of the case.

In 51 A. L. R. 522 the text says: "It is well settled that a loan of money or property, to be repaid under all conditions and to be compensated for by a share in earnings, income or profits, in lieu of or in addition to interest, is usurious if it clearly is contemplated that an amount exceeding legal interest is to be paid."

In Weaver v. Burnett, *et al.,* 101 Iowa 567, 81 N. W. 771, it was said: "Even if we adopt plaintiff's theory of the case, there was a loan of $1,200 to the defendant, which he

(defendant) agreed to repay at a certain time and without contingencies, together with the highest rate of interest which the law permits. But he says that in addition thereto, he was to have one-half the profits that defendant might make in the use of the money so loaned. Is such a transaction usurious? We are quite willing to agree that if there was a consideration entirely separate and distinct from the loan or forbearance for the defendant's promise to pay plaintiff one-half the discount he received in taking up the $1,400 in notes, such agreement would not make the transaction usurious. See Neefus v. Vanderveer, 3 Sanf. Ch. 268. But such is not the fact. Plaintiff was to have one-half the discount, in addition to the legal rate of interest, in consideration of the use of his money, and nothing less. If there was any other thing that he did or agreed to do, in consideration of the defendant's promise to pay this additional compensation we have failed to find it. Plaintiff did nothing more than loan the defendant $1,200. True, the defendant agreed to pay that amount on a particular debt, and in so doing he made something over $380; but his agreement to pay plaintiff half of that sum was in consideration of the loan, and as compensation for the use of the money. The transaction, even from plaintiff's standpoint, will bear no other interpretation. We are also ready to agree with plaintiff's counsel when they say that a loan is free from usury where in lieu of interest a share of the profits expected to be realized by the borrower is agreed bona fide to be given to the lender as compensation for the loan. Johnston v. Ferris, 14 Daly 302; Goodrich v. Rogers, 101 Ill. 523. But it is also true that a stipulation for a share of the profits in addition to the principal and legal interest is usurious. Sweet v. Spence, 35 Barb. (N. Y.) 44. The rule is well stated by Chancellor WALWORTH in Colton v. Duncan, 2 Paige 269, as follows:

" 'Whenever, by the agreement of the parties, a premium of profit beyond the legal rate of interest, for a loan or advance of money, is, either directly or indirectly, secured to the lendor, it is a violation of the statute, unless the loan or advance is attended with some contingent circumstances by which the principal is put in evident hazard. A contingency merely nominal, with little or no hazard to the principal of the money loaned or advanced, cannot alter the legal effect of the transaction. * * *

" 'Where there is a negotiation for a loan or advance of money, and the borrower agrees to return the amount advanced at all events, it is a contract of lending; * * * and whatever shape or disguise the transaction may assume, if a profit beyond the legal rate of interest is intended to be made out of the necessities or improvidence of the borrower, or otherwise, the contract is usurious.' See also Brakely v. Tuttle, 3 W. Va. 133; Cleveland v. Loder, 7 Paige 557; Leavitt v. De Launy, 4 N. Y. 363; Browne v. Vredenburg, 43 N. Y. 195; Barnard v. Young, 17 Ves. 44; Clift v. Barrow, 108 N. Y. 187, 15 N. E. 327—which illustrate the exception stated by Chancellor WALWORTH. See also Canal Co. v. Vallette, 21 How. 414, 16 L. Ed. 154. The case is not ruled by Comstock v. Wilder, 61 Iowa 274, 16 N. W. 108, relied upon by plaintiff."

The cases cited in the opinion above quoted amply sustain the holding there enunciated.

In the Master's Report we find the following language: "However, under the broad provisions of Section 6937, C. G. L. where usurious contracts are defined to be: 'All contracts for the payment of interest upon loan, advance of money or forebearance to enforce the collection of any debt, *or upon any contract whatever* at a higher rate of interest than ten per cent per annum, are hereby declared

usurious,' (underscoring by the Master), the mortgage contract in this case was, and is, technically usurious."

The Chancellor approved this finding of the Master.

The Master fixed a penalty upon the lender which he thought met the exigencies of the case and this was approved by the Chancellor. Were it not for the mandatory provisions of the usury statute, *supra*, we would look with approval upon the conclusion reached, but it is not our province to suspend valid ctatutes. If we did so we would invade the province of the legislature and thereby violate organic law.

Beach entirely fails to arouse our sympathies. It may be that he designedly entered into this contract which he knew was tainted with usury and which, therefore, could not be fully enforced if the law of usury should be invoked against it. But that fact cannot change or modify the force and effect of the statutes, *supra*, denouncing usury in this State. While the application of the law in this case is harsh, the Court is bound to follow the law as it is found to be, although its application in isolated cases may work a hardship.

It follows that the decree must be reversed and the cause remanded for the entry of a decree not inconsistent with the views herein expressed.

So ordered.

Reversed.

TERRELL, C. J., and WHITFIELD and THOMAS, J. J., concur.

BROWN and CHAPMAN, J. J., dissent.

## ON REHEARING

BROWN, J. (dissenting)—After giving due consideration to the arguments made on rehearing granted, I am still of

the opinion that the decree of the court below should be affirmed.

The report of the Special Master, which was approved by the Circuit Judge, gives a very fair summary of the evidence and the salient points of law involved. Said report reads in part as follows:

"At the outset the Master is frank to state that whether or not usury has been established is a very close question. Following a certain line of decisions the answer could well be in the affirmative though by following a line of other decisions it could as well be in the negative.

"To sustain the usurious nature of the transaction the defendant, Julian J. Beach, testified substantially as follows:

"That in November or December of the year 1928 he made arrangements with the Dade County Security Company wherein he could take up his three mortgages, upon which a total balance of $14,174.06 was then due, by paying in cash the sum of $7,087.03 and in stock the like sum of $7,087.03. That, at the time, the property was encumbered by a second mortgage in favor of E. A. Waddell upon which he owed a balance of $709.80.

"That shortly thereafter, through Mr. Chase, a local real estate broker, he contacted plaintiff, Andrew Kirk, from whom he requested a loan of $10,000.00, telling him that out of the proceeds of such loan he could take up the three Dade County mortgages, and, by adding a little cash to the $1,500.00 worth of Dade County stock owned by witness, also satisfy Waddell's second mortgage. That Kirk agreed to advance the $10,000.00, but would have to charge a bonus of 15% for making the loan. That the transaction was closed in the office of the Dade County Security Co., at which time, at defendant's instance, plaintiff gave the Company his two checks, one for $7,087.03 representing the

cash payment, and the other for $2,406.07 representing stock purchased. At the same time plaintiff also gave defendant his check for $603.12 for defendant's $1,500.00 worth of Dade County Stock, which said stock was used in the settlement.

"Upon the contrary the plaintiff, Andrew Kirk, testifies, in substance, as follows:

"That in the latter part of 1928 he was approached by defendant's agent, Chase, who stated that a friend owed Dade County Security Company about $14,000.00 on a mortgage which was about to be foreclosed; that said mortgage could be settled for 50% in cash and 50% in stock. That throughout the entire negotiations he only met the defendant upon one occasion, all of his dealings being with the agent, Chase, who was 'a friend of a friend' of his and in whom he placed implicit confidence. In rebuttal plaintiff positivly denies demanding a bonus of $1,500, and denies any agreement to loan any money as such to the defendant. Upon this point his testimony is as follows: 'I was to buy certificates and pay cash to the Liquidator to liquidate a mortgage of fourteen thousand and some dollars in the Dade County Security.' Question: 'Was that one mortgage?' Answer: 'Three mortgages, I think it was. I know it was something over $14,000.00, and it was uncertain as to the exact amount because the stock was fluctuating from day to day.' (Transcript, p. 75) Asked to explain getting the mortgage for $11,500.00, the witness testified on pages 77 and 78 as follows: 'It was put up to me that it was a $14,000.00 mortgage or a fraction more that was on some property, and the man was in a bad shape, wanted to raise the money. They were going to foreclose on him. He wanted to know if I would take up the buying of this stock and pay cash to discharge this mortgage. It was a matter of a little over $14,000.00 that was at stake

and he would give me a note for $11,500.00. There was a difference of a few thousand dollars that he could easily afford to share with me.' Q. 'Was that the agreement then that you were to share in the savings?' A. 'Nothing else to it.'

"In substance the defendant's agent, Edwin A. Chase, when called as a witness for plaintiff, testified as follows:

"That defendant came to him under quite a strain, and stated if he could get somebody to take up the Dade County mortgage he could save 50% of that mortgage and get an extension of new life, as they were about to foreclose; that he was never asked to secure a loan, but merely requested to get some one to pick up those mortgages, and that defendant would pay 10% to get some one to pick up the mortgages. That when witness contacted plaintiff about taking up these mortgages, the statement was made that it would be an accommodation and a help to a worthy man in distress. That nothing was said about loaning any money, the conversation relating to the purchase of stock and the taking up of the mortgages. That nothing was said about any payment to plaintiff for so doing. That the witness considered that he was acting for both parties. That witness took the abstract to his own lawyer. That the price of Dade County Security stock was fluctuating. That the ten percent was to be paid plaintiff for his services in securing the stock and advancing the money to have the Dade County mortgages discharged. That, as security, plaintiff was to take back a new mortgage upon the identical property together with a fifteen-acre tract of land near the town of Modello.

"From all of the evidence, including the testimony of the three witnesses as specifically noted above, I, as Master have reached the conclusion that the defendant has failed to meet and carry the burden of proof imposed on him by

the averments of his answer, in that he has failed to establish by a preponderance of clear and satisfactory evidence his charge that plaintiff wilfully violated the provisions of the usury statute as set forth in Section 6938, Florida C. G. L., 1927. Plaintiff, in most emphatic language, denies that he ever demanded a bonus either from Beach, the defendant, or from Chase, the broker. In this denial plaintiff is supported by the testimony of Chase, whereas there is no testimony to support defendant's contention that a bonus of $1,500.00 was demanded. In the beginning it is clear that Chase was acting as the duly authorized agent of the defendant. Before the deal was actually closed it is likewise apparent that Mr. Chase also acted, at least in several instances, as agent for plaintiff. The evidence shows that Mr. Kirk, the plaintiff, was a newcomer to Florida, having located in this state with the hope of recovering from a nervous breakdown, and had no intention whatever of wilfully violating the statutes of this State prohibiting usury. The evidence further shows that Mr. Beach, the defendant, was, at the time and for years prior thereto actively engaged in business in Miami as a licensed real estate broker and insurance agent. That the terms of the contract originated with the defendant, and that at no time did plaintiff regard the transaction as a loan of money. The latter's contention being that he was to take up the three outstanding Dade County mortgages by acquiring from a fluctuating market and turning over to the liquidator; approximately $7,000.00 worth of stock certificates and $7,000.00 approximately, in actual cash. This contention, again, is strongly supported by the testimony of Mr. Chase, who reiterated there was never any mention of any loan of money, all conversations and understandings relating solely to purchase of stock in Dade County Security Company

and taking up the three mortgages then held by the liquidator of said Company.

"Applying the law to the facts as found above:

"In the case of Chandler, *et ux.,* v. Kendrick, 146 So. 551, the Supreme Court of Florida, speaking through Mr. Justice TERRELL said: 'Under the law and the decisions, usury is a matter largely of intent. It is not fully determined by the fact of whether the lender actually gets more than the law permits, but . . . whether there was a purpose in his mind to get more than legal interest for the use of his money, and whether, by the terms of the transaction and the means employed to effect the loan, he may by its enforcement be enabled to get more than the legal rate. Benson v. Trust & Savings Bank (Fla), 142 So. 887; R. C. L., pp. 223, 224.

"A thing is wilfully done when it proceeds from a conscious motion of the will, intending the result which actually comes to pass. It must be designed or intentional, and may be malicious, though not necessarily so. 'Wilful' is sometimes used in the sense of intentional, as distinguished from 'accidental,' and, when used in a statute affixing a punishment to acts done wilfully, it may be restricted to such acts as are done with an unlawful intent. Clark v. Gray, 101 Fla. 1058, 132 So. 832; United States v. Boyd (C. C.) 45 F. 851, text 855; State v. Clark, 29 N. J. Law 96.'

"In the latter case, cited as Pushee v. Johnson, 123 Fla. 305, 166 So. 847, our State Supreme Court, in an opinion by Mr. Justice BUFORD, concurred in specially by the late lamented Mr. Justice DAVIS, after quoting with approval the law as announced in the Chandler v. Kendrick case, *supra,* goes a step further by saying:

" 'The theory upon which laws against usury have been enacted, and the principle which has governed in their

interpretation, have always been, that the borrower was at the mercy of the lender, and subject to his utmost exactions and avaricious demands, unless protected by laws.' And the last sentence of Mr. Justice DAVIS' concurring opinion reads as follows: 'The usury law was intended as a shield of defense, not as a means of borrowers getting something for nothing on mere legal technicalities.' * * *

"However, under the broad provisions of Section 6937, C. G. L., where usurious contracts are defined to be: 'All contracts for the payment of interest upon loan, advance of money, or forbearance to enforce the collection of any debt, *or upon any contract whatever* at a higher rate of interest than ten per cent per annum, are hereby declared usurious' (underscoring by the Master), the mortgage contract in this case was, and is, technically usurious. This being so, plaintiff should not be permitted to collect from the defendant more than the actual amount originally expended by him, plus interest at the rate of 8% per annum, after deducting all interest heretofore actually received."

It thus appears that by reason of appellee's buying the necessary stock and paying the necessary cash, the result of the transaction was that appellant Beach's existing debt was reduced from $14,174.06 to $11,500.00, and in addition Beach thereby secured a five-year extension; a most advantageous transaction for Beach. The latter profited much more therefrom than did appellee Kirk.

The stock of the Security Company, while selling at a fluctuating discount, was received by the Security Company as money, and served as such, at par, up to fifty per cent of the mortgages in question.

In the case of Haywood v. Le Baron, 4 Fla. 404, this court held (quoting the second headnote) that:

"Where there is a loan of bank notes which, though depreciated at the time, yet serve as money, both the

borrower and the lender acting *bona fide* and innocently, regarding and treating the notes as money, and there is no shift or device to cover a loan of money, and thus evade the statute against usury, the transaction is not usurious."

Applying this holding to the facts of this case as found by the court below, and correctly so, I seriously doubt if there was even "technical usury" in this transaction; certainly not wilful or intentional usury. What Beach gained by the transaction far exceeded the so-called "bonus" alleged to have been charged him by Kirk. Kirk, at Beach's request, saved Beach from the foreclosure of a mortgage indebtedness of over $14,000.00, and now seeks to wipe out the entire indebtedness by claiming Kirk was guilty of wilful usury and should, under the penalties provided by Section 6939 for wilful usury, suffer a forfeiture which would wipe out his entire indebtedness to Kirk. Under the facts of this case, this defense is inequitable and if allowed would result in a great injustice, and one never contemplated by our laws against usury.

The case of Chandler v. Kendrick, 108 Fla. 450, 146 So. 551; Pushee v. Johnson, 123 Fla. 305, 166 So. 847, and Jones v. Hammock, 131 Fla. 321, 179 So. 674, cited in the opinion of Mr. Justice CHAPMAN in the instant case, support the conclusions of the court below. The defense of wilful usury set up in appellant's answer to the bill was not borne out. The weight of the evidence as to the true nature of the transaction was to the contrary.

For these reasons, as well as those advanced by Mr. Justice CHAPMAN, the decree appealed from should be affirmed.