190 So.2d 415 (1966)
RIVER HILLS, INC., Appellant,
v.
Donald C. EDWARDS and Daisy Ida Edwards, His Wife, Appellees.
No. 6608.
District Court of Appeal of Florida. Second District.
September 23, 1966.
*417 Satterfield & Stamathis, Tarpon Springs, for appellant.
Ford, Wilson & Walker, Largo, for appellees.
HODGES, JOHN G., Associate Judge.
This is a timely appeal from a final decree in an action to foreclose a mortgage secured by a loan alleged to have been usurious for charges of interest in excess of 15% under the interest forfeiture provisions of F.S. Section 687.03, F.S.A., and also in excess of 25% under the total forfeiture provisions of F.S. Section 687.07, F.S.A. Appellant, River Hills, Inc., was the borrower and defendant below. Appellees, Donald C. Edwards and his wife, Daisy Ida Edwards, so completely passive as a party litigant that we should not refer to her again, were the lenders and plaintiffs below.
The plaintiff, Donald C. Edwards, was born and reared in Canada and, prior to his making Pinellas County his permanent home in August of 1961, was self-employed as an insurance adjuster. At the time of the transaction involved here, he was primarily engaged in investing and loaning money. He became acquainted with Henry Blanton, Secretary of River Hills, Inc., during the spring of 1962. Mr. Blanton was active in the real estate business in St. Petersburg, and was also an officer of other corporations. He was familiar with corporate financing.
River Hills, Inc., was a corporation formed for the purpose of constructing on its land a first-class trailer park. It was contemplated that a commitment would be received by F.H.A. to guarantee a loan to cover costs of the project. The complete project, however, had apparently bogged down and both management and money were needed to get it moving when Mr. Edwards appeared on the scene. Mr. Blanton did not have time to supply management to the venture. The president of the corporation, a Mrs. Greenfield, was not located in the area, and Nick Stamathis, Esquire, corporate attorney and vice-president, was too busy with other matters to appropriate time to the undertaking. Mr. Edwards, although he was free to devote time to the project, did not have available American money with which to meet the corporation's financial needs. He did, however, have funds in Canada.
During October of 1962, it was agreed between the officers of the corporation and Mr. Edwards that:
1. Mr. Edwards would make a loan to the corporation, to be secured by a note *418 and mortgage on the corporate realty to be improved, in the face amount of $27,500. $20,000 would be advanced to pay the corporation's outstanding liabilities. $5,000 would be retained until such time as the corporation received the F.H.A. commitment, at which time it would then be used to pay various expenses, fees and closing costs, and the remaining $2,500 was the estimated "cost of exchange" of transferring sufficient Canadian funds to provide $25,000 in American currency for purposes of the loan.
2. The plaintiff would act as manager of the corporation for a period to terminate four months after the F.H.A. commitment was obtained. He would not obligate the corporation and was not authorized to hire employees. He was to pay his own expenses during this period but was given 1039 shares of the common voting stock of the corporation as specific consideration for his managerial efforts for the period mentioned. Thereafter, he was to be paid at least $1000 per month in cash for his services to River Hills, Inc.
3. Upon receipt of the F.H.A. commitment, Mr. Edwards would release from his mortgage lien that portion of the corporation's property on which the initial construction would begin.
4. Should the mortgage be accelerated or become payable, Mr. Edwards would make sufficient funds available to prevent foreclosure upon terms to be agreed upon.
Thereafter, the entire agreement was referred to legal counsel for the drafting and approval of appropriate instruments for formal implementation of the intention of the parties. River Hills, Inc. Attorney Stamathis prepared the employment contract, the note, the mortgage and the release. These documents were all duly approved, executed and delivered. The note and mortgage were in the face amount of $27,500, payable $5,000 at the end of one year and the balance at the end of two years, with interest at 15% from date until paid. It is undisputed that both parties knew the applicable interest limitations under the usury laws of Florida and that the actual amounts to be repaid on the loan created an excess of at least some of such limitations, although they deny specific intent to violate the usury statutes. The parties were also aware that the rate of exchange called for the expenditure of only 2,001 Canadian dollars; however, they agreed that no adjustment would be made and that the original estimate of $2500 would stand as the actual "cost of exchange". There is no evidence that counsel for the parties advised them that the agreement would violate the usury laws, and it was inferred, at least, that no violation was involved.
After Plaintiff Edwards began working on the affairs of River Hills, Inc., it developed that no feasible report had been made on the project and that the maximum F.H.A. loan that could be obtained would be $312,000, although the plans then extant would call for a far greater sum to complete the project. He then had conferences with the engineers, architects, officers of the corporation, the Florida Power Corporation, and others, for the avowed purpose of revising and modifying the plans so as to bring them into line with what could reasonably be expected to be financed. On or about June 1, 1963, he submitted proposals to the F.H.A., and about June 30, 1963, the F.H.A., with certain reservations, agreed to the changes proposed by Mr. Edwards.
However, complications developed. Henry Blanton changed architects during June of 1963, and the corporation had persistent financial problems. Moreover, the project engineer began pressing for payment of his fees during the fall of 1963, and on November 8, 1963, filed a mechanic's lien foreclosure. Thereafter, River Hills, Inc., requested Mr. Edwards to apply portions of the $5,000 reserved for the F.H.A. closing costs and expenses and to honor other obligations, but Mr. Edwards refused, *419 leading to real and insurmountable difficulties between the parties.
On March 14, 1964, Mr. Edwards filed his complaint to foreclose the mortgage involved, alleging that he was the holder and owner of a note of the defendant in the amount of $27,500, but that the note included $5,000 which was to be advanced to the defendant upon its obtaining an F.H.A. commitment for financing a trailer park being developed by the defendant on its property, and since the commitment was not forthcoming, the $5,000 was not advanced; further, that the defendant, River Hills, Inc., had defaulted on the note and mortgage and owed the plaintiff the sum of $22,500 plus interest at the rate of 15% from November 17, 1962. The complaint further provided for foreclosure upon default of payment of the alleged sums found to be due.
Defendant filed an answer and counterclaim denying that $22,500 was advanced, asserting that only $20,000 was advanced. Two affirmative defenses were also interposed, one alleging usury under Florida Statute § 687.03, F.S.A., and the other alleging usury under Florida Statute § 687.07, F.S.A. The counterclaim alleged that the defendant received $20,000 plus a statement that an additional $5,000 would be available, and that plaintiff received in return (a) a promissory note in the amount of $27,500 and (b) the remaining unissued stock of the defendant corporation consisting of 1,039 shares having a par value of $10,390. The issuance of the stock was said to be ostensible consideration for the plaintiff's acting as general manager of the defendant corporation, but that the plaintiff knowingly and willfully failed to devote the time and diligence necessary and, further, that the stock was taken as usurious interest. It was finally alleged that the foregoing was done with a knowing, willful and corrupt intent by plaintiff to exact a greater sum of money than allowed by law, invoking forfeiture provisions of F.S. Sections 687.04 and 687.07, F.S.A.
To summarize, the loan was comprised of the following components:

 (a) Amount actually received ................................ $20,000
 (b) Amount retained in possession, use and control of
 plaintiff, to be advanced on occurrence, but only on
 occurrence, of future contingency of F.H.A. commitment,
 which might not occur. (contingency never occurred, so
 money never advanced) ................................... 5,000
 (c) Estimated "cost of exchange" (the plaintiff alleges that
 $2500 was the estimate of cost and that the actual cost
 was $2,001, leaving a balance of $499 retained by the
 plaintiff). The plaintiff further states that when the
 defendant was told of the actual cost and balance, the
 defendant told plaintiff to keep said balance. Defendant
 alleges that plaintiff knew what the actual cost of the
 exchange would be at the time of the loan; that the
 "estimate" was the maximum possible charge and that,
 therefore, in any event, he knowingly and willfully
 overcharged the defendant in this regard ................ 2,500
 Total of loan at 15% interest per annum after date, until
 paid .................................................... 27,500

Motions for summary judgments for both parties were heard before the Court and denied. On defendant's motion, the Court held that the charge for Canadian exchange was knowingly made and constituted usury, but denied the motion on the ground that there remained the issue of willful and corrupt intent, the burden of proof of which was upon the borrowing defendant. To counter the lender's unsupported disclaimer of a subjective corrupt intent to violate the law in this regard and to meet the burden thus imposed, *420 the defendant sought to introduce and proffered a number of contemporaneous contracts between the lending plaintiff and other borrowing parties to prove the state of mind of the plaintiff with reference to the usurious charges. This evidence was not admitted and the proffers were rejected by the Court. Six months later the Court reversed its position with regard to the rate of exchange charge and announced its ruling that, although the charges were knowingly usurious, they did not invoke forfeiture because no corrupt intent to violate the law had been proved by the defendant. The defendant then moved for permission to present further evidence to prove facts relating to the nature of the rate of exchange of the foreign funds involved and the actual expenses connected with their transfer, but this motion was also denied by the Court. The final hearing was held on December 2, 1964, and the Court's final decree was entered on August 11, 1965, earlier on which same date the Court denied the defendant's motion to produce additional testimony. Pertinent portions of the Court's findings, on which its final decree was predicated, are set forth as follows:
"2. That the Defendant corporation sought a loan from the plaintiff, DONALD C. EDWARDS, for Twenty-Five Thousand Dollars ($25,000.00); but that the Plaintiff did not have United States funds available to make the loan, although he did have Canadian funds available, which he was willing to lend to the corporation.
"3. That it was agreed between the Defendant corporation and Donald C. Edwards, that the cost of the exchange of the Canadian funds to United States funds would be borne by the Defendant corporation. At the time of the agreement between the parties it was estimated that the cost of the exchange would be Two Thousand Five Hundred Dollars ($2,500.00), and the note from the Defendant corporation to Donald C. Edwards was made payable in the principle sum of Twenty-Seven Thousand Five Hundred Dollars ($27,500.00) on or about November 13, 1962.
"4. The Court finds that the charge for exchange may properly be charged to the borrower and such a charge did not make the loan usurious even though the maximum legal rate of interest is provided for in the note, said charge for exchange being expressly provided for in Florida Statutes 687.05.
"5. That while it was estimated that Two Thousand Five Hundred Dollars ($2,500.00) would be necessary to cover the cost of exchange, only Two Thousand One Dollars ($2,001.00) was required for this purpose. That the actual cost of the exchange was not known until subsequent to the contract between the parties so the original contract could not be usurious in its inception in any event. However, Four Hundred Ninety-Nine Dollars ($499.00), the difference between the actual cost of exchange; that is, Two Thousand One Dollars ($2,001.00) and Two Thousand Five Hundred Dollars ($2,500.00), the estimated cost of exchange, must be deducted from the principal amount of the note; no interest is allowable on the Two Thousand One Dollars ($2,001.00).
"6. The Court further finds that Twenty Thousand Dollars ($20,000.00) was advanced to the Defendant corporation on about the date and time of delivery of the note, and that the additional Five Thousand Dollars ($5,000.00), by agreement between the parties, was not to be advanced to the Defendant corporation immediately, but was to be used for a specific purpose. That the Five Thousand Dollars ($5,000.00) was not set apart by the Plaintiffs in a special fund or account, but at all times he had sufficient funds available to pay over the Five Thousand Dollars ($5,000.00) when needed by the Defendant corporation for the specific purpose for which it was retained. That the contingency upon which the *421 Five Thousand Dollars ($5,000.00) was held did not materialize and the Five Thousand Dollars ($5,000.00) was not advanced to the Defendant corporation; therefore, no interest can be charged on the Five Thousand Dollars ($5,000.00) which was not actually paid over to the Defendant corporation.
"7. The Court further finds that as to the Five Thousand Dollars ($5,000.00) principal withheld, that this was not done by the Plaintiff with the intent of receiving more compensation than the law allows nor with the corrupt intent to evade the usury laws.
"8. The Court generally finds that the Plaintiff, DONALD C. EDWARDS, intended to make the various charges called for in the contract between the parties; that he intended to charge a maximum rate of interest, together with all charges that could properly and lawfully be charged against the Defendant corporation; and that it was not the Plaintiff's intention, at any time, to exact more than the law would allow, nor to evade the usury statutes of the State of Florida.
"9. That although the retention by the lender of the Four Hundred Ninety-Nine Dollars ($499.00) referred to in Paragraph 5 was an excessive charge, the amount exacted did not exceed twenty-five per cent (25%); thus no forfeiture provisions of F.S.A. 687.04 are not operative."
The Court entered judgment for the plaintiff in the amount of $22,001 plus interest on $20,000 from November 13, 1962, to May 28, 1965, at 15% per annum, totalling $7,625.38, making the total judgment, with costs, the sum of $29,701.28, constituting a lien on the mortgaged premises of the defendant, and also awarded counsel for the plaintiff attorney's fees in the amount of $2,000. The Court further decreed that, upon default of payment, the property covered by the loan and mortgage be sold by way of foreclosure to satisfy the lien. No disposition of the defendant's counterclaim was specifically made in the final decree.
The defendant has appealed from the final decree.
The belief that assimilation by the loan agreement of the unusual interrelated circumstances bearing upon its creation deactivated whatever usurious influences as may have been present was apparently indulged by the Chancellor. Because, in his lengthy, careful and conscientious consideration of the entire factual complex, he attempted to purge the transaction of illegal infection by amending and rewriting in the Court's final decree the contract between the parties so as to leave them unscathed by usury. In his judicial zeal to effect purification, upon facts improperly and not fully developed, under a misconception of applicable law and without support from the legal effect of the evidence which was admitted, substantial error was committed, as will be seen.
The appellant has advanced in a scholarly brief a compendium on appeal of nine points covered or suggested by some fourteen assignments of error relating to the alleged contamination of the loan with illegal interest. Two of these points, we believe, are sufficiently dispositive of the issues on appeal to reverse and remand the case for further proceedings.
In order of chronologic advancement, the first point concerns the validity of the charge of $2500, which was added by the lender to the obligation of the borrower as a cost of exchanging sufficient Canadian funds to make available $25,000 in American money to cover the loan to the borrowing corporation.
The record discloses that the lower court, apparently until the time of the final hearing and throughout final argument, was of the opinion that this charge was improper. In clear and unequivocal language, beginning on the occasion of the hearing on defendant's motion for summary judgment and ending at the conclusion of the final hearing, the Court, on at least six different *422 occasions, demonstrated its firm belief that this charge was usurious and not allowable. The Chancellor's latest statement, at final hearing, referring to the plaintiff, Edwards, (P 141, TR) was: "I find this man willfully and intentionally violated the usury laws, not criminally, but he intended to get more, which he did, than the law allowed. He got $2500." Shortly prior thereto, in his summation, before directing the entry of the final decree, the Court, again referring to the plaintiff, Edwards, said: "* * * So this man willfully and intentionally exceeded the usury laws when he charged that $2500 to convert that Canadian money."
During the trial proceedings the Court also apparently recognized the fact but not the intent of usury in two other particulars; i.e., (1) the overcharge of $499 on the so-called "cost of exchange" and (2) the charge for interest to be paid on a portion of the note in excess of the amount actually loaned, inasmuch as the Court held that the interest thus contracted for could not be collected but excused forfeiture under the statute.
Before concluding the final hearing and the taking of testimony, the Court stated it wished to study its findings and to review and reweigh the evidence. And as already recited in the preliminary statement of facts, six months later, at final argument, the Court reversed its stated position and ruled that the charge of actual foreign exchange was proper and collectable from the borrower. This was so, in the Court's opinion, because there was no evil and corrupt intent on the lender's part, in addition to knowledge and willfulness.
Under these circumstances, the defendant was not aware and, indeed, could not have been cognizant at the trial, that it was either proper or necessary for him to present evidence to the Court relative to the facts concerning expense and the true nature of the foreign exchange involved. The Court's denial of the defendant's motion to present additional testimony in this regard was, therefore, erroneous.
The Court did not and could not have made a proper determination of the allowable cost of exchanging and transferring the currency on the basis of the evidence before it. A difference in value of currency is not a cost of exchange. The fact alone that twelve Mexican pesos have the same value as one American dollar would not justify a charge for cost of exchange of over 800% in transferring and exchanging pesos for American currency any more than a charge of 100% for exchanging twenty nickels for ten dimes could be legally justified. The $2500 estimated cost of exchange was arrived at by calculating that it would take 27,500 Canadian dollars to purchase 25,000 American dollars.
The actual rate of exchange between the two currencies, according to the lender, necessitated 2,001 additional Canadian dollars or 27,001 Canadian dollars to purchase 25,000 American dollars.
When confronted with the foregoing facts, the appellee contends that the charge for exchange mentioned in the statute had, for its purpose, compensation for the difference in value of money from place to place and from time to time; that Canadian currency fluctuated in value as related to United States currency and that by choosing his time the appellee could bring the funds in the United States at a par or even at a premium. He reasons that this is analogous to selling securities at a loss in order to secure funds to loan and that such losses, when added to the principal amount loaned, have been approved by courts in jurisdictions other than Florida as being nonusurious.
This argument, first of all, assumes expense or loss to the lender which has not been proved in this case. The exchange rate has not been shown to have caused any detriment to Edwards, the lender. Indeed, he may have actually gained upon the purchase and use of Canadian funds for repurchase of American dollars for the loan as far as actual value is concerned. The cases cited by the appellee, wherein *423 losses on the sale of securities to produce loan funds have been added to the principal without activating usury, simply hold that where such losses are added to the loan, it is a question of fact for the jury to determine whether the primary purpose of the loan was to make a profit for the lender or for accommodation, or some other ameliorating purpose. If for the former purpose the loan would be usurious; and if for the latter the few authorities cited by the appellee-lender have held it would not be so infected. (Stevens v. Staples, 64 Minn. 3, 65 N.W. 959; Joffe v. Vonn, 3 Cir., 14 F.2d 50, cited by appellee)
The charge for exchange which is contemplated by the statute, Section 687.05, Florida Statutes, F.S.A., and which does not taint the loan with usury, includes actual expenses for making available at a particular place funds on deposit at another place. The lender may add the actual charges of exchange to the loan and require the borrower to pay. But he may not simply charge the difference in currency value under the ratios established by international rates of exchange as a legitimate cost chargeable to the borrower. Little imagination is required to contemplate the interest rates which would be possible and the profits obtainable if a charge of this sort were allowed.
There is no evidence in the record, then, to legally support the Chancellor's finding with respect to the expense of exchanging the funds involved. The holding that the estimated difference in value of American and Canadian currency, or any part of it, was a legitimate charge forms the basis of the Court's error in refusing the defendant's motion to produce additional testimony in this regard.
The second point, broader in scope, concerns the intent of the lender upon which the whole question of usury depends. This point induces consideration of all the requisites of a usurious transaction as they relate to a determination of intent. Risking an overspreading of the issues before us with unnecessary judicial pronouncement, we think it may be helpful, nevertheless, to restate the principles governing the ultimate question before us.
Keeping in mind that the purpose of usury statutes is to bind the power of creditors over necessitous debtors and prevent them from extorting harsh terms in the making of loans, (Benson v. First Trust and Savings Bank, 105 Fla. 135, 142 So. 887, 145 So. 182; R.P.C.L., Pages 223-224, and Stewart v. Nangle, 103 So.2d 649) the essential legal constituents are listed as follows:
1. There must be a loan, expressed or implied, and an understanding between the parties that the money loaned shall be returned. (Stewart v. Nangle, supra; Doster v. English, 152 N.C. 339, 67 S.E. 754)
2. That for such loan a greater rate of interest than is allowable by law shall be paid, or agreed to be paid, as the case may be. (Clark v. Grey, 101 Fla. 1058, 132 So. 832)
3. There must exist a willful and corrupt intent to receive or charge more interest than the legal rate for the use of money loaned. (Stewart v. Nangle, supra; Doster v. English, 152 N.C. 339, 67 S.E. 754)
4. The intent is not fully determined by whether or not the lender actually gets more or charges more than the law permits but by whether or not there was an improper motive in his mind to get more than the legal interest (Clark v. Grey, supra; Stewart v. Nangle, supra; Shaffran v. Holness, Fla.App., 102 So.2d 35) at the time the loan agreement is entered and, if usurious at that time, no subsequent transaction will purge it. (Shorr v. Skafte, Fla., 90 So.2d 604) The difference between a lawful transaction and a usurious one, therefore, is the difference between "good faith" and "bad faith". The parties are permitted to testify as to their purposes and intentions, and the question of intent *424 is to be gathered from the circumstances surrounding the entire transaction. (See Diversified Enterprises, Inc. v. West, 141 So.2d 27, 31; Kay v. Amendola, 129 So.2d 170)
5. That the lender willfully and with corrupt intent charged or accepted more than the prohibited interest must be specifically and affirmatively pleaded and established by clear and satisfactory evidence. (Chandler v. Kendrick, 108 Fla. 450, 146 So. 551; Argintar v. Lydell, 132 Fla. 45, 180 So. 346; Benton v. Wilkins, 118 Fla. 491, 159 So. 518) The requisite corrupt or purposeful intent, however, is satisfactorily proved if the evidence establishes that the charging or receiving of excessive interest was done with the knowledge of the lender. (Italics ours) (Stewart v. Nangle, supra; MacRackan v. Bank of Columbus, 164 N.C. 24, 80 S.E. 184, 49 L.R.A.,N.S., 1043, Ann.Cas., 1915D, 105; Shorr v. Skafte, supra; Jones v. Hammock, 131 Fla. 321, 179 So. 674; Shaffran v. Holness, supra)
6. Neither ignorance of the law of usury nor the fact that the suggestion of the usurious rate emanated from the borrower, nor that it was the opinion of counsel that the loan was not violative of the statute, nor the fact that a plan or scheme to circumvent usury was embraced by both parties, where the amount of interest is in fact usurious and known to the lender to be, will absolve him from the penalties involved because of usury. (Lee Construction Corp. v. Newman, Fla.App., 143 So.2d 222; Ross v. Whitman, Fla.App., 181 So.2d 701; Carr v. Cole, 119 Fla. 260, 161 So. 392; Beach v. Kirk, 138 Fla. 80, 189 So. 263; Hormuth v. Dickson, 115 Fla. 790, 156 So. 127)
Notwithstanding the fact that the record established and the lower court found therefrom that the parties knew and understood that amounts in excess of the 15% interest provided for the money loaned were to be repaid, the lower court was of the opinion that it was not the lender's intention to willfully exact more interest than the law would allow or to evade the usury statutes; that even though the loan agreement on its face and the evidence disclosed that the lender knowingly and intentionally provided for repayment of excess money which would amount to usurious interest, the burden of proving "evil and corrupt" intent was upon the borrower. When the latter attempted to rebut the presumption of good faith ascribed to the lender by the Court, the Court refused the defendant's proffer of alleged contemporaneous usurious contracts entered into by the lender to overcome the presumption. This also was error.
The presumption of lawful purpose and proper intent on the part of the lender dissolved upon the showing that the excess interest was knowingly and intentionally charged, and the burden then shifted to him to explain away all legal inferences of corrupt intent. (Stewart v. Nangle, Ross v. Whitman, Shorr v. Skafte, Jones v. Hammock, Shaffran v. Holness, supra) Once sufficiently explained, the burden would then shift again to the borrower to prove the required obnoxious motive. To put the borrower to the task of proving, subjectively, the lender's culpable mental processes at the time the loan contract was entered would place an impossible burden upon the borrower and frustrate the purposes of the statute.
We are not holding here that the transaction as passed upon by the lower court was or was not usury, either under F.S. Section 687.07, F.S.A., calling for forfeiture of principal and interest, sometimes referred to as the criminal usury statute, or under F.S. Section 687.04, F.S.A., calling for forfeiture of interest only, sometimes referred to as the civil usury statute, as the facts upon which those determinations are made must be developed before the lower court. Accordingly, the decree and judgment are reversed and remanded for further proceedings on all the issues involved *425 and for appraisal of the evidence by the judge of the lower court under the principles hereinabove set forth.
ALLEN, C.J., and PIERCE, J., concur.